In re ALLEGHENY INTERNATIONAL, INC., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., Chemetron Corporation, Integrated Specialties, Inc., Allegheny International (USA), Inc., Al–Industrial Products, Inc., Allegheny International Exercise Co., Woodshaft, Inc., Chemetron Investments, Inc., Infoswitch, Inc., and Eliskim, Inc., Debtors.

Bankruptcy No. 88–00448.
Motion Nos. 90–2458M, 90–2529M, 90–2789M and 90–4219M.
Adv. No. 90–260.

United States Bankruptcy Court, W.D. Pennsylvania.

July 12, 1990.

As Amended July 25, and Aug. 2, 1990.

Reconsideration Granted in part and Denied in part Aug. 2, 1990.

Stephen I. Goldring, Asst. U.S. Trustee, W.D. Pa., Pittsburgh, Pa., for U.S. Trustee.

Douglas A. Campbell, Campbell & Levine, Pittsburgh, Pa., for The Official Committee of Unsecured Creditors for Sunbeam.

Robert G. Sable, Sable, Makoroff & Libenson, Pittsburgh, Pa., for The Official Committee of Unsecured Creditors for Allegheny International, Inc.

David A. Murdock, Kirkpatrick & Lockhart, Pittsburgh, Pa., for the Mellon Bank Group.

Denis F. Cronin, Wachtell, Lipton, Rosen & Katz, New York City, for Marine Midland Bank, N.A.

M. Bruce McCullough, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for Allegheny Intern., Inc.

Richard S. Toder, Zalkin, Rodin & Goodman, New York City, for Chemical Bank.

Joseph A. Katarincic, Katarincic & Salmon, Pittsburgh, Pa., James W. Giddens, Hughes Hubbard & Reed, Herbert P. Minkel, Jr., Fried Frank Harris Shriver & Johnson, Andrew Levander, Shereff, Friedman, Hoffman & Goodman, New York City, for Japonica Partners, L.P.

Richard A. Gitlin, Hebb & Gitlin, P.C., Hartford, Conn., for Ins. Co. Lenders.

David T. Sykes, Duane, Morris & Heckscher, Philadelphia, Pa., for AI Investments, L.P.

Joel M. Walker, Pollard, Walker & Vollmer, Pittsburgh, Pa., for Prudential

Capital Investments and Prudential Ins. Co. of America.

John M. Elwood, Director of Reorganization, Allegheny International, Inc., Pittsburgh, Pa., for Allegheny Intern., Inc.

Securities & Exchange Com'n, New York City, for Securities & Exchange Com'n.

Larry D. Henin, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Official Committee of Equity Security Holders.

Timothy T. Brock, Gordon Hurwitz Butowsky Weitzen Shalov & Wein, New York City, for Fidata Trust Co. New York.

Rhoda J. Freeman, Cowen & Co., New York City, for Cowen & Co.

## MEMORANDUM OPINION

JOSEPH L. COSETTI, Chief Judge.

The matter presently before the court is the debtor's [1] motion to confirm its plan of reorganization and the objections of various parties to confirmation. The court confirms the plan of reorganization, subject to the conditions and limitations set forth below. Intertwined with the motion to confirm is the Debtor's Motion Under Bankruptcy Code Section 1126(e) to Designate and Disqualify Votes of Claims and Interests Directed by Japonica Partners and Others Acting in Concert (the "debtor's motion to designate"). Also pending are Japonica's Motion Under Bankruptcy Code Section 1126(e) to Designate and Disqualify Votes of Claims and Interests Not Solicited or Procured in Good Faith ("Japonica's motion to designate") and the Motion of the Official Committee of Equity Security Holders of Allegheny International, Inc. to Disqualify All Votes on the Debtor's Stock Plan Pursuant to Bankruptcy Code Section 1126(e) (the "Equity Committee's motion to designate").

In addition, the group of 16 banks who were prepetition secured lenders to the debtor have brought an adversary action at Adversary No. 90–260 seeking equitable relief against Japonica Partners, L.P. ("Japonica") and its affiliates.

The debtor's motion to designate is granted; the votes of which are the subject of that motion are disqualified. Japonica's motion to designate and the Equity Committee's motion to designate are denied, but based on those facts certain limitations, discussed below, are imposed on certain of the secured lenders and the debtor's insiders, as well as Donaldson, Lufkin and Jenrette ("DLJ") and its affiliates. With respect to the action against Japonica by the bank group, Japonica and its affiliates are enjoined, as set forth below.

The instant matters are core proceedings, involving confirmation of a plan of reorganization, 28 U.S.C. § 157(b)(2)(L), and "other proceedings affecting ... the adjustment of the debtor-creditor or the equity security holder relationship...." 28 U.S.C. § 157(b)(2)(O). This court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. § 1334.

This opinion shall constitute findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052.

## I. THE MOTIONS TO DESIGNATE

In preparation for trial on the instant matters, intense discovery occurred. The discovery took the form of multitudinous depositions, including multiple depositions of the same person—compressed into a short time. The discovery activity included allegedly "cloak and dagger" activities to serve deposition notices on certain parties and equally clever methods to avoid depositions. Especially of note for reasons we will discuss infra, Japonica was unable to serve a deposition notice on Daniel Lufkin, the secured lenders' designated member of the board of directors of the reorganized debtor.

Unless it is necessary to repeat certain facts in the interest of clarity, the court will not burden readers with the history of

---

1. In this opinion, the court refers to Allegheny International, Inc. ("AI"), Sunbeam Corporation ("Sunbeam"), Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., Chemetron Corporation ("Chemetron"), and ten of the fourteen subsidiaries that filed for chapter 11 relief on May 3, 1988 collectively as the debtor.

the first 22 months of this case. The parties to these matters are painfully aware of those facts. For the uninitiated, those facts are available in numerous memorandum opinions by this court, both published and unpublished. For the motions to designate, we take up the saga, beginning on December 29, 1989, when the debtor filed the instant plan of reorganization. The court conducted several days of hearings on the disclosure statement in January 1990.[2] The court approved the debtor's disclosure statement on February 5, 1990, setting the last day to ballot on the debtor's plan as March 30, 1990, at 5:00 P.M.

However, on January 24, 1990, near the conclusion of the hearings on the debtor's disclosure statement, Japonica filed its plan of reorganization (the "Japonica plan") and disclosure statement which mirrored and utilized in large part the debtor's material and organization. The court was urged by Japonica not to approve the debtor's disclosure statement until Japonica's disclosure statement could be approved and a joint ballot distributed. Japonica requested an extraordinary reduction in the time the rules provided for confirmation. The court feared additional delay and denied the request. The court set separate schedules for confirmation of the plans and promised Japonica an opportunity for creditors to vote on the Japonica plan before any order of confirmation would be issued.

The Japonica plan offered cash equivalent to $6.42 per share with holdbacks, as compared to the debtor's proposed stock plan which offered $7.00 per share. Under the Japonica plan, Japonica would acquire control of the debtor. Deposition of Michael G. Lederman, Esq., 4/20/90, 290; 5/3/90, 66. Although Japonica had indicated its interest in acquiring control of the debtor as early as July 1989, Japonica held no interest as a creditor or equity holder of the debtor until immediately prior to the filing of its proposed plan and disclosure statement. To qualify as a party in interest authorized to file a plan, Japonica purchased public subordinated debentures of the debtor with a face value of $10,000 for $2,712. At that time, the court was unaware that the purchase of claims would be the tactic used by Japonica to gain control.

A. *Acquisition of Claims by Japonica*

On February 23, 1990, Japonica began purchasing claims of the secured bank lenders, Class 2.AI.2. This occurred after the debtor's disclosure statement was approved and the debtor's plan balloting had commenced. This was also after Japonica had proposed a plan and disclosure statement and had become a proponent of a plan. The purchase of the following claims gave Japonica control of approximately 27% of the claims in Class 2.AI.2:

| NAME OF BANK | DATE SOLD | FACE AMOUNT | PRICE PAID | % OF FACE AMOUNT |
|---|---|---|---|---|
| Canadian Imperial Bank of Commerce ("CIBC") | 2/23/90 | $12,614,800 | $10,121,543.25 | 80.24% |
| Israel Discount Bank of New York | 2/23/90 | 2,803,289 | 2,247,005.25 | 80.16% |
| The Northern Trust Company | 2/26/90 | 5,606,578 | 4,498,462.50 | 80.24% |
| Harris Trust and Savings Bank | 2/26/90 | 11,213,154 | 8,966,925.00 | 79.97% |
| NCNB National Bank of North Carolina | 3/13/90 | 8,409,868 | 6,747,237.00 | 80.23% |
| First National Bank of Boston | 3/23/90 | 9,811,511 | 8,339,784.35 | 85% |

---

2. Japonica's counsel was present, but did not participate, at those hearings.

Debtor's Exhibit D-1. On or about March 26, 1990, Japonica purchased the claim of Continental Bank, N.A. ("Continental"), with a face amount of $12,614,800, for $11,-984,060, or 95% of the face amount. Following the purchase of the claim of Continental, Japonica held 33.87% of the claims in Class 2.AI.2, enabling Japonica to block an affirmative vote by that class on the debtor's plan of reorganization. 11 U.S.C. § 1126(c).[3] After achieving its blocking position, Japonica purchased the claim of Bank of Hawaii, with a face amount of $2,242,630, for $1,838,956.60, or 82% of the face amount. Under the terms of the assignments by the aforementioned banks, Japonica caused the votes of the claims it purchased to be voted against the debtor's plan.[4]

In addition to purchasing the claims for cash, Japonica agreed to indemnify the assigning banks for all expenses and liability arising from certain lawsuits against the members of Class 2.AI.2. At least some of the assigning banks would not sell their claims unless Japonica agreed to assume such liability. For example, CIBC would not have sold its claim at any price unless Japonica agreed to assume the expenses and liability arising from those lawsuits. The most notable of those lawsuits is an adversary action in this court, at Adversary No. 88–186, in which the Official Committee of Unsecured Creditors of Allegheny International, Inc. (the "Creditors' Committee")[5] has sued the secured bank lenders under theories of preference, fraudulent conveyance, equitable subordination, and lender liability.[6]

Japonica also purchased claims from senior unsecured creditors in Class 4.AI.2. Ja-ponica purchased the claims of Swiss Volksbank and certain other holders of Swiss Franc notes, with a face amount of $21,793,590, for $14,383,769.40, or 66% of the face amount. Japonica caused the votes of these claims to be voted against the debtor's plan. Although Japonica purchased less than ⅓ of the claims in Class 4.AI.2, its negative votes were sufficient to defeat the debtor's plan in that class because of the large number of claims in Class 4.AI.2 that did not vote. It should be noted that Swiss Volksbank was a member of the Creditors' Committee and the Creditors' Committee had recommended a favorable vote on the debtor's plan. It should also be noted that the Creditors' Committee, on behalf of all these unsecured creditors, is a plaintiff in the bank litigation. Unsecured creditors, such as the holders of the Swiss Franc notes, have interests adverse to the interests of the secured bank lenders and would benefit from a favorable result in the litigation. Therefore, Japonica has purchased claims which constitute a blocking position in two classes whose interests are diametrically opposed in the bank litigation.

## B. *The Debtor's Motion to Designate*

Section 1126(e) of the Bankruptcy Code, 11 U.S.C. § 1126(e), empowers the court to "designate" (i.e., disqualify) the ballot of "any entity whose acceptance or rejection ... was not in good faith or was not solicited or procured in good faith...." However, the Bankruptcy Code does not define "good faith." There are few precedents, none controlling, concerning 11 U.S.C. § 1126(e); therefore, we look to the plain language of the section and section 203 of

---

**3.** Section 1126(c) of the Bankruptcy Code, 11 U.S.C. § 1126(c), provides as follows:

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

**4.** One other bank, Chase Manhattan Bank, N.A., voted against the debtor's plan. That bank has been identified as a potential lender to Japonica.

**5.** The Official Committee of Equity Security Holders of Allegheny International, Inc. (the "Equity Committee") has intervened as a plaintiff.

**6.** See the Settlement of Adversary No. 88–186, which is discussed in detail at Section IV(A).

the Bankruptcy Act, the precursor of section 1126(e), as well as the cases interpreting section 203 of the Act.

Section 203 of the Bankruptcy Act provided that "[i]f the acceptance or failure to accept a [Chapter X] plan by the holder of any claim or stock is not in good faith, in light of or irrespective of the time of acquisition thereof, the judge may ... direct that such claim or stock be disqualified for the purpose of determining the requisite majority for the acceptance." In *Young v. Higbee Co.*, 324 U.S. 204, 211, 65 S.Ct. 594, 598, 89 L.Ed. 890 (1945), the Supreme Court declared that "the history of [section 203] makes clear that it was intended to apply to those stockholders whose selfish purpose was to obstruct a fair and feasible reorganization...." The history of section 203, which the court discussed in a footnote, remains relevant:

> A year before the House Committee on the Judiciary held its extensive hearings on the Chandler Act a Circuit Court of Appeals held that a creditor could not be denied the privilege of voting on a reorganization plan under Sec. 77B, although he bought the votes for the purpose of preventing confirmation unless certain demands of his should be met. *Texas Hotel Corporation v. Waco Development Co.*, 5 Cir., 87 F.2d 395. The hearings make clear the purpose of the Committee to pass legislation which would bar creditors from a vote who were prompted by such a purpose. To this end they adopted the 'good faith' provisions of Sec. 203. Its purpose was to prevent creditors from participating who 'by the use of obstructive tactics and hold-up techniques exact for themselves undue advantages from the other stockholders who are cooperating.' Bad faith was to be attributed to claimants who opposed a plan for a time until they were 'bought off'; those who 'refused to vote in favor of a plan unless ... given some particular preferential advantage.' Hearings on Revision of the Bankruptcy Act before the Committee on the Judiciary of the House of Representatives,

75th Cong., 1st Sess. on H.R. 6439, Serial 9, pp. 180–182.

*Id.* at 211 n. 10, 65 S.Ct. at 598 n. 10.

From the preceding paragraph, it is clear that section 203 of the Bankruptcy Act was enacted, inter alia, in response to *Texas Hotel Securities Corp. v. Waco Development Co.*, 87 F.2d 395 (5th Cir.1936), *cert. denied sub nom.*, *Waco Development Co. v. Rupe.*, 300 U.S. 679, 57 S.Ct. 671, 81 L.Ed. 883 (1937); *see also* S. Neely, *Claims Assignments*, Southeastern Bankruptcy Law Institute Program Material, K–19 (1990). That case is strongly analogous to the case at bar. Because of the strong similarity, and because section 203 is the precursor of section 1126(e), it is appropriate to examine that decision.

In 1928, Waco Development Company ("Waco") deeded a vacant lot to Texas Hotel Securities Corporation ("THSC"), an entity run by Conrad Hilton. THSC built and furnished a hotel on the lot with money raised from the issuance of mortgage notes. The hotel, but not the furniture, was then deeded back to Waco which assumed the mortgage notes. THSC then leased the hotel and made further improvements to the hotel not required by the lease. THSC ultimately defaulted on the lease. In a Texas state court proceeding, the lease was canceled and the furnishings and the value of the improvements were forfeited to Waco.

Waco subsequently sought to reorganize under section 77B of the Bankruptcy Act. THSC acquired claims against Waco for the avowed purpose of controlling the plan of reorganization so that THSC could ostensibly recover losses associated with the cancellation and forfeiture and regain management of the hotel. In this connection, Hilton voted against the plan of reorganization, which had provided that the hotel would be leased to another entity.

The Court of Appeals for the Fifth Circuit held that Hilton's negative vote, which resulted in failure to confirm, was not improper or unlawful. However, William O. Douglas, who was then a commissioner of the Securities and Exchange Commission, saw Hilton's actions as "extort[ing] tribute

from other creditors and stockholders as the price of their assent to a plan." Securities and Exchange Commission, Report on the Study and Investigation of the Work, Activities, Personnel and Functions of Protective Reorganization Committees, Part VIII at 121 (1940); *see Young v. Higbee*, 324 U.S. at 211 n. 10, 65 S.Ct. at 598 n. 10.

In the case at bar, Japonica, by acquiring a blocking position, has defeated the debtor's plan and can defeat any other plan and thereby obstruct a "fair and feasible reorganization." *Id.* at 211, 65 S.Ct. at 598. Japonica, like Hilton in the *Waco* case, bought a blocking position after the debtor proposed its plan of reorganization. In *Waco*, Hilton's objective was to force Waco to reestablish Hilton's interest in the hotel. In the instant case, Japonica's interest is to take over and control the debtor. Section 1126(e) and its predecessor were intended to enable the court to disqualify the votes of parties who engage in such conduct.

In a subsequent case interpreting section 203 of the Bankruptcy Act, the Circuit Court of Appeals for the Second Circuit held that the purchase of claims for the purpose of securing approval or rejection of a plan of reorganization is not per se bad faith:

> The mere fact that a purchase of creditors' interests is for ... securing the approval or rejection of a plan does not of itself amount to 'bad faith.' When that purchase is in aid of an interest other than an interest as a creditor, such purchases may amount to 'bad faith' under section 203 of the Bankruptcy Act.

*In re P–R Holding Corp.*, 147 F.2d 895, 897 (2d Cir.1945). Bankruptcy courts interpreting section 1126(e) have quoted this language with approval. *In re Gilbert*, 104 B.R. 206 (Bankr.W.D.Mo.1989); *In re MacLeod Co., Inc.*, 63 B.R. 654 (Bankr.S.D. Ohio 1986). Although Lederman testified that he voted against the plan for economic reasons, the court does not find the economic reasons offered by Japonica creditable. We find that Japonica acted "in aid of

an interest other than an interest as a creditor...." *In re P–R Holding*, 147 F.2d at 897. The overriding fact that causes this court to reach this conclusion is that Japonica chose to buy claims which gave it unique control over the debtor and the process. With one minor exception, Japonica purchased its claims—and became a creditor—after the debtor's disclosure statement was approved. Japonica knew what it was getting into when it purchased its claims. Japonica is a voluntary claimant. If Japonica was unsatisfied by the proposed distribution, it had the option of not becoming a creditor. Japonica could have proposed its plan without buying these claims.

### 1. The Court Finds that Japonica Acted in Bad Faith

■ Japonica's actions with respect to the purchase ·of claims were· in bad faith. Notwithstanding Japonica's allegedly longstanding interest in the debtor, Japonica filed its plan of reorganization at the eleventh hour.[7] Notwithstanding Japonica's allegedly longstanding interest in the debtor, Japonica did not purchase significant claims until the voting period on the debtor's plan. Japonica was also at this time a proponent of a plan. The particular claims that Japonica purchased, and the manner in which they were purchased, can be used to determine their intent. Japonica purchased a clear blocking position in Class 2.AI.2, the secured bank lenders. Because that class was the most senior class, a negative vote in that class made confirmation extremely difficult, if not impossible. Japonica paid approximately 80% of the face amount for the first five claims in Class 2.AI.2. As Japonica approached ownership of 33% in amount of this class, it paid 85% of the face amount for the next claim, that of First National Bank of Boston. It then purchased the claim of Continental Bank for *95% of the face amount.* This gave Japonica 33.87% of the amount of Class

---

7.  Bankruptcy Rule 3016 provides that "[a] party in interest, other than the debtor, who is authorized to file a plan under § 1121(c) ... may file a plan *at any time before the conclusion of the*

*hearing on the disclosure statement...."* (emphasis added). Japonica filed its plan of reorganization on January 24, 1990—the last day of the hearing on the debtor's disclosure statement.

2.AI.2 claims. Thereafter, Japonica purchased one more bank claim, but only for 82% of the face amount. If Japonica purchased bank claims solely for economic purposes, it would not have paid 95% of the face amount and then returned to an 82% purchase. Instead, it purchased almost exactly the amount required to block the plan of reorganization.

Lederman was a bankruptcy lawyer who clearly understood the significance of 33⅓% of a class. The court finds from these facts Japonica's purpose was control and was in bad faith. Japonica recited to the court that it wanted to provide cash to creditors. Japonica's plan proposes to pay cash to creditors, but with a portion held back pending resolution of unresolved claims. Because the court believed this recitation, the court granted additional time to Japonica for its plan. However, the court was misled. Japonica's purpose was control and so we find.

Similarly, Japonica purchased only enough claims in Class 4.AI.2 to block an affirmative vote by that class. That class follows Class 2.AI.2 in priority. Thus, Japonica purchased a blocking position in the two highest classes which were impaired, ensuring that the debtor could not confirm its plan of reorganization. Again, we note that the two classes in which Japonica purchased claims have directly opposite interests with respect to the bank litigation. The court is hard pressed to characterize Japonica's actions as merely furthering their own economic interests.

■ Votes must be designated when the court determines that the "creditor has cast his vote with an 'ulterior purpose' aimed at gaining some advantage to which he would not otherwise be entitled in his position." *In re Gilbert*, 104 B.R. at 216; *see also Insinger Machine Co. v. Federal Support Co. (In re Federal Support Co.)*, 859 F.2d 17 (4th Cir.1988).

In *In re MacLeod*, 63 B.R. at 656, the bankruptcy court designated the votes of dissenting creditors who were competitors because the court concluded that those votes were cast for the "ulterior purpose of destroying or injuring debtor in its business so that the interests of the competing business ... could be furthered." Although the debtor and Japonica are not engaged in competing businesses, the court finds *In re MacLeod* analogous to the case sub judice. Japonica and the debtor were proponents of competing plans of reorganization. Japonica's stated purpose was to take over the debtor. To do so, it was necessary for Japonica to block confirmation of the debtor's plan of reorganization. Thus, the court concludes that Japonica's actions were for an ulterior motive.

Under chapter 11, creditors and interest holders vote for or against a plan of reorganization, after adequate disclosure, if such vote is in their best economic interests. If, as in the instant case, an outsider to the process can purchase a blocking position, those creditors and interest holders are disenfranchised. If competing plans of reorganization are pending, the court must consider the preferences of the creditors and interest holders. If a plan proponent, such as Japonica, can purchase a blocking position, the votes of the other creditors and interest holders are rendered meaningless. Moreover, Japonica, who chose to become a creditor, should not have veto control over the reorganization process. The court does not believe that such a result was intended by Congress. Therefore, for all of the reasons stated above, the court designates the votes of Japonica pursuant to 11 U.S.C. § 1126(e) in Class 2.AI.2 and Class 4.AI.2.

### C. *The Alleged Milligan Conspiracy*

Prior to voting on the debtor's plan of reorganization, various creditors expressed concern about the liquidity and stability of the stock they would receive under the debtor's plan. Those creditors, particularly the secured lenders, emphasized the need for an orderly sale mechanism for creditors who did not wish to hold the stock long-term. They feared that large blocks of stock would be sold soon after the plan was consummated and as a result of these big sales, the market would be flooded and the price of the stock would be depressed. The unsecured creditors also feared the banks

could cause a control transaction to occur, defeating the purpose of the reorganization plan and making the warrants worthless.

From depositions it appears that in late January 1990, Charles O'Hanlon, a representative of Mellon Bank, N.A., the agent for the consortium of 26 banks that comprised the secured lenders, met in Florida with representatives of the debtor, including James D. Milligan, the chief executive officer of Sunbeam and the chairman, chief executive officer, and chief executive officer-designate of the reorganized AI, to discuss, inter alia, the concerns of the secured lenders about the liquidity of the stock and request a mechanism for sale of the stock by those banks that would want to sell. At that meeting, O'Hanlon asked Milligan and Samuel H. Iapalucci, the vice president and chief financial officer, to help locate prospective purchasers of the reorganization stock. O'Hanlon and Milligan both agreed that neither Milligan nor the debtor should actually be involved in the sale or purchase of the stock. However, an officer of Standard Chartered Bank testified that John Elwood, the director of reorganization for the debtor, advised him of the possibility of a buyer of the when-issued shares. Deposition of David W. Robie, 22–25. An officer of National Westminster Bank testified about a similar conversation with Anthony Munson, the treasurer of the debtor. Deposition of Michael E. Mahoney, 23–24.

Although the exact chronology is unclear from the record, Milligan had discussions with various potential investors familiar to him, including Melvyn Klein, Daniel Lufkin,[8] and the Belzberg Brothers of Canada, concerning purchase of the reorganization securities. O'Hanlon and Gerald Shapiro, chairperson of the Creditors' Committee, had agreed that "DLJ" would be acceptable.[9] At some time, Milligan advised Lawrence M. v. D. Schloss of DLJ that he had spoken with representatives of GKH Partners, who had indicated interest in purchasing the reorganization securities upon their issuance.

On March 7, 1990, at a meeting in Lufkin's office in New York City, Milligan told Lufkin that the aforementioned investors, and others, had "a desire to own equity in whatever company I ran, and that creditors had expressed a desire to sell equity, and they had selected or intended to indicate that DLJ could act as an agent on behalf of would-be purchasers...." Milligan Deposition, 121–22. Iapalucci was also present at that meeting; he explained the plan, including the "poison pill" or change of control provision. That provision provides that no entity or entities acting in concert could acquire more than 30% of the when-issued stock without the offer being made to all shareholders. *Id.* at 128–32. The next day, Milligan, Iapalucci, representatives of DLJ, and representatives of GKH met at DLJ's offices. Shortly after that meeting, as part of their due diligence, representatives of DLJ and GKH toured

---

8. Lufkin is the secured lenders' designated member of the board of directors of the reorganized debtor. Because of his failure to cooperate with discovery attempts, the court bars him from serving on the board of directors.

9. DLJ is well known to this court; on two previous occasions during the course of this bankruptcy, DLJ attempted to acquire the debtor. On November 2, 1988, the debtor entered into a letter of intent and preliminary agreement with DLJ, by which DLJ would acquire the debtor. Thereafter, a competing proposal was submitted by Paul S. Levy, Peter A. Joseph, and Angus C. Littlejohn (the "Levy Group"). The court instructed the debtor to consider the bid of the Levy Group and the responsive bid of DLJ. The debtor selected the revised DLJ proposal and entered into a revised letter of intent with DLJ on November 16, 1988.

The Levy Group then submitted another proposal which the debtor rejected. However, shortly before the meeting of the debtor's board of directors to approve the final DLJ proposal, DLJ informed the debtor that it had reached an agreement with the Levy group to sell them two major business units of the debtor. The debtor then moved to void the agreement with DLJ.

On or about February 22, 1989, the debtor entered into an agreement and plan of merger with a company formed by DLJ. Milligan was a participant with DLJ in the plan and was to have been the chief executive officer and a director of the company formed by DLJ. The transaction between the debtor and DLJ was never consummated because the debtor failed to meet certain projections. However, the debtor retained Milligan as a consultant, and later made him president of Sunbeam Corp.

various facilities of the debtor. Milligan participated in those tours.

On or about March 16, 1990, DLJ advised those secured lenders who had not sold their claims that a "group of investors has proposed buying when-issued stock from the individual AI Secured Banks. The proposed purchase price is $6.25 per share." Thereafter, Schloss advised the bank group's financial advisor, Houlihan Lokey Howard & Zukin ("Houlihan Lokey") of the outline of the plan to purchase the when-issued stock. Houlihan Lokey then notified all of the banks, and provided DLJ with the names and addresses of the contact people for each of the members of the bank group.

DLJ acted as the agent for those investors. Deposition of Frank E. Krepp (Pittsburgh National Bank), 26; Mahoney Deposition, 30. The identities of those investors were undisclosed at the time of the offer. Deposition of Charles F. O'Hanlon, III, 87; Deposition of Harvey L. Peckins (Bank of New York), 88; Robie Deposition, 32. The DLJ offer was made to every member of Class 2.AI.2 who had not assigned its claim to Japonica. DLJ, acting on behalf of its investors, negotiated individually with each bank that was interested in selling its when-issued shares, ultimately entering into Stock Purchase Agreements with the following banks: Bank of America National Trust and Savings Association; Bank of New York; Commerzbank Aktiengesellschaft; Citizens and Southern National Bank; M & I Marshall & Illsley Bank; Bank One; Manufacturers Hanover Trust Company; Barclays Bank PLC; Bayerische Vereinsbank AG; The Bank of Tokyo Trust Company Moia Group Ltd.; Pittsburgh National Bank; and First American Bank. Neither Milligan nor any other representative of the debtor were involved in the negotiations. O'Hanlon Deposition, 131, 183–84; Deposition of Samuel H. Iapalucci (4/12/90, p.m.), 51, 83, 130; Krepp Deposition, 23, 26, 77, 107; Milligan Deposition, 63, 85; Robie Deposition; Deposition of Lawrence M. v. D. Schloss, 62–63.

The stock purchase agreements did not require the banks to vote in favor of the debtor's plan. Deposition of Eren Hussein (Barclay's Bank), 32; Krepp Deposition, 22–23; Mahoney Deposition, 47; Peckins Deposition, 80–82; Robie Deposition, 32. In fact, some of the banks required a specific provision to that effect in their stock purchase agreements. Krepp Deposition, 22–23, 69–70, 78–79, 97–98, 100; Mahoney Deposition, 47. However, the stock purchase agreements required the banks to use their "best efforts" to effectuate such agreements. Three banks which did not enter into stock purchase agreements voted in favor of the debtor's plan.[10]

Prior to March 16, 1990, the debtor had arranged a meeting with Swiss Volksbank. That meeting was requested by Swiss Volksbank, Milligan Deposition, 157, and was intended as a discussion of the company and the plan of reorganization. On the morning of March 19, 1990, the following people met with representatives of Swiss Volksbank: Oliver Travers, the chairman and chief executive officer of the debtor; Munson; Robert Martin of Smith Barney Harris & Upham, the debtor's financial advisor; and M. Weston Chapman of DLJ.[11] At that meeting, counsel for Swiss Volksbank indicated to Chapman that the Swiss noteholders were interested in selling their stock; they did not want to hold stock in a reorganized company. Deposition of Mark Weston Chapman, 21–22, 25–26. None of those parties offered to purchase any of the reorganization stock of the Swiss noteholders, although Chapman raised that possibility at another meeting later that day. Swiss Volksbank stated that they had received an offer from Japonica, so that time was of the essence. *Id.* at 26–27; Travers Deposition, 68. DLJ and the Swiss Volksbank did not enter into a stock purchase agreement, but it appears that they began the process. As stated

---

**10.** Morgan Guaranty Trust Company of New York, Standard Chartered Bank, and Grant Street National Bank (the successor-in-interest to Mellon Bank, N.A.).

**11.** When Travers left for Switzerland, he was unaware that a representative of DLJ would be attending that meeting; he did not learn that fact until he was en route.

above, Japonica ultimately purchased a significant portion of the Swiss Franc notes.

As of March 30, 1990, when the voting on the debtor's plan concluded, the court had not approved Japonica's disclosure statement. Therefore, creditors and interest holders could only vote for, or against, the debtor's plan. The court approved the Japonica disclosure statement on May 3, 1990.

### 1. Votes in Favor of the Plan Will Not Be Designated

The motions to designate which Japonica and the Equity committee have filed seek to designate all votes filed in favor of the debtor's plan. Japonica and the Equity Committee assert that the transactions involving DLJ, Milligan, and the secured lenders were not disclosed, in violation of 11 U.S.C. § 1125. Japonica and the Equity Committee contend that the other creditors would not have voted for the debtor's plan if they had known about the alleged "Milligan conspiracy." They assert that the purpose of the transaction was to take control of the debtor and entrench Milligan and certain debtor executives as the management. Japonica and the Equity Committee further assert that such control of the debtor was to be obtained without paying a premium to other creditors. Japonica and the Equity Committee also assert that the debtor has discriminated against certain creditors and the equity holders as a result of the attempted transaction with DLJ. Japonica and the Equity Committee further assert that the debtor's plan was proposed in bad faith, in contravention of 11 U.S.C. § 1123. In this connection, the parties agree that many of the issues raised in these two motions overlap with objections to confirmation.

■ Although the court will not designate all votes on the debtor's plan of reorganization, as requested by Japonica and the Equity Committee, certain activities and matters which the court finds objectionable will be dealt with in the context of confirmation. Section 1126(e) provides that

the court may designate the votes of "any entity whose acceptance or rejection ... was not in good faith, or was not solicited or procured in good faith...." Even if the court should hold that the attempted transaction between DLJ and the banks was not in good faith, the court cannot disqualify the votes of the other remaining claimants who knew nothing about the transaction. The remedy under 11 U.S.C. § 1126(e) is to disqualify acceptances or rejections that have been improperly solicited. *Trans World Airlines, Inc. v. Texaco, Inc. (In re Texaco, Inc.)*, 81 B.R. 813 (Bankr.S.D.N.Y. 1988). Simply stated, the court should designate the votes of only those creditors or interest holders who were engaged in wrongdoing. There is no authority for designating the votes of innocent creditors or interest holders.[12]

■ Nor do we find sufficient grounds for designating the votes of the banks that accepted the various offers. Although we are concerned by the conduct of DLJ and the secured banks, we cannot conclude that the banks voted "in aid of an interest other than an interest as a creditor...." *In re P-R Holding*, 147 F.2d at 897. Unlike Japonica, the banks have been parties to this case since that fateful Saturday afternoon in February 1988. Similarly, we cannot conclude that the banks acted for an improper or ulterior motive. *In re Pine Hill Collieries Co.*, 46 F.Supp. 669 (E.D.Pa. 1942). The banks voted for the debtor's plan because they thought it to be in their best interest. The banks favored the debtor's plan even without the possibility of selling their shares. Mahoney Deposition, 47; Hussein Deposition, 32; Krepp Deposition, 21–22; Deposition of Gev F. Nentin (Manufacturers Hanover Trust Company), 102–103; Deposition of Craig Wolf (Citizens and Southern Bank), 26–28. Notwithstanding their concerns about the liquidity of the reorganization shares, the banks intended to vote for the debtor's plan of reorganization. Hussein Deposition, 39–40; Deposition of Robert TenHave (Commerz-

---

12. It should be noted that the Creditors' Committee has indicated its continuing support of the debtor's plan, notwithstanding the matters of which Japonica and the Equity Committee complain.

bank) 20; Krepp Deposition, 42–43; O'Hanlon Deposition, 43–46. Although some of the aforementioned testimony may have been self-serving, it is consistent with the representations made in court over the last several months. An earlier, similar, permutation of the present plan of reorganization was a joint submission of the debtor and the bank group, although the plan of reorganization sub judice was not filed jointly with the bank group.[13] The court finds that the attempted transaction between DLJ and the banks did not cause the banks to change their intended votes for the debtor's plan. Moreover, three banks that did not enter into agreements with DLJ voted in favor of the debtor's plan and their votes would be sufficient to carry the class.

It must also be emphasized that the contemplated purchase price for the when-issued shares, $6.25, was not a premium. It fell within the range of estimates that previously had been made of the value of the when-issued shares, and is consistent with the court's determination of value, discussed below. It should be noted that Japonica later purchased the claims of Class 4.AI.2 at a price equivalent to $7 per share.

However, because it appears to the court that the transactions with DLJ may have permitted DLJ or others to take control of the debtor, the court treats these matters as objections to confirmation. The court does not view those events as a "Milligan conspiracy," although it finds the process inept and ill-timed and lacking disclosure.

All of the parties know that this reorganization has been a fragile process. Consensus has been virtually unattainable. The court questions the thought given to these activities which could upset the delicate process. The third involvement of DLJ is incredible, in light of this court's oft-stated disgust with their earlier failed efforts.

Nevertheless, the court denies the motions of Japonica and the Equity Committee to designate all other votes in favor of the

debtor's plan. Later in the context of confirmation, the court will resolve the matters it finds inequitable.

## II. THE COMPLAINT OF THE BANKS FOR EQUITABLE RELIEF AND TO RESTRAIN JAPONICA AND ITS AFFILIATES

On April 14, 1989 Japonica announced a tender offer for all claims in Class 7.AI.1, the subordinated debt, and for certain of the claims in Class 5.CH.1, Chemetron general unsecured claims. This tender offer was held open until May 16, 1990. Through the tender offer, Japonica acquired approximately 62% of the claims in Class 7.AI.1 and 36% of the debentures in Class 5.CH.1.

On May 3, 1990 the court approved Japonica's disclosure statement. The court notes that on that date Japonica's tender offer was still outstanding. Therefore, from the approval of its disclosure statement on May 3, 1990, until the expiration of the tender offer, May 16, 1990, Japonica was soliciting claims outside its plan while it was a proponent both before and after it had an approved disclosure statement.

The court further notes that on June 7, 1990 Japonica purchased the claims of several insurance companies in Class 4.AI.2, senior unsecured claims. Those creditors had voted against Japonica's plan. Thereafter, on June 8, 1990, the final day for voting on Japonica's plan, those insurance companies moved for leave to change their vote. Japonica purchased those claims for $7.00 per share—more than the $6.42 per share which was offered by the Japonica plan.

The results of the balloting on Japonica's plan were filed with the court on June 21, 1990. Three classes of creditors and one class of interest holders did not accept the Japonica plan. The Japonica plan voting results appear as follows:

**13.** Based on the representations of counsel, all of the banks agreed to file the joint stock plan. Subsequently, a few of the banks decided against the joint stock plan. However, the banks continued to support the debtor's plan.

| Class | % of the Voters | % of the Dollars |
|-------|-----------------|-------------------|
| 2.AI.2 | 36 | 38 |
| 4.AI.2 | 87 | 17 |
| 5.AI | 84 | 80 |
| 5.CH.1 | 92 | 66 |
| 7.AI.1 | 88 | 95 |
| 8.AI.1 | 92 | N/A |
| 8.AI.2 | 74 | N/A |
| 9.AI.1 | 47 | N/A |

It should be noted again at this point that Japonica's plan was allowed to go forward for voting by creditors because it promised a cash payout to the creditors. Although the court believed the debtor's plan could be confirmed, creditors had consistently expressed strong interest in receiving cash rather than stock. Therefore, the court indulged Japonica and allowed it to go forward with its plan. The Japonica cash plan failed to win the approval of three classes of creditors and cannot be confirmed.

While the above balloting transpired, Japonica was permitted to perform due diligence of the debtor pursuant to an order of court dated March 15, 1990, which Japonica requested. Although there was an early dispute prior to the order regarding the debtor's cooperation with Japonica, on the whole it appears that the debtor more than complied with this court's order. In fact, the debtor provided Japonica with office space and use of other facilities at their general office in Pittsburgh. On June 11, 1990, M. Bruce McCullough, Esq., the debtor's chief bankruptcy counsel, informed Japonica that their due diligence process was terminated and that they would have to leave the debtor's general office at the end of that business day.

On June 12, 1990, a group of 16 banks commenced an adversary action, at Adversary No. 90–260, against Japonica and its affiliates. That action seeks, inter alia, the following equitable relief: enjoining Japonica from interfering with the management or exercising control over the business or property of the debtor; requiring that all distributions to Japonica be held as security for the performance of certain obligations under the certificate of reorganization of the reorganized debtor and enjoining Japonica from exercising control over the reorganized debtor; prohibiting Japonica from designating directors of the reorganized debtor; limiting the distribution to Japonica to the lesser of the amount they paid to purchase the claims or the distribution provided in their plan; or, equitably subordinating the claims purchased by Japonica to all other claims.

The defendants have answered and raised counterclaims and third party claims. The court separated the trial of issues arising under the adversary complaint from the counterclaims and third party complaint and limited the hearing to matters that were related to the confirmation of the debtor's plan of reorganization. Japonica demanded a jury trial; the court denied that request.

In a factually related matter, the debtor's motion to designate, the court found that Japonica entered upon a course of conduct designed to gain control of the debtor. The facts in this proceeding reinforce the court's finding of bad faith conduct of Japonica to further manipulate the bankruptcy process by the strategic purchase of claims. The court intends to issue an injunction related to the issues of control and governance.

### A. Public Tender Offer of the Subordinated Debentures While Japonica Was a Proponent of a Plan

■ Japonica, a proponent of a plan, chose an "end run" around the bankruptcy process by purchasing through its public tender offer approximately 62% of a class. Before the Japonica disclosure statement was approved, Japonica launched a public tender offer for all claims in Class 7.AI.1 and for certain of the claims in Class 5.CH.1. The tender offer expired during the voting period for the Japonica plan. Pursuant to its tender offer, Japonica acquired approximately 62% of Class 7.AI.1 and 36% of the debentures in Class 5.CH.1.

Japonica did not receive this court's approval for its tender offer. As a plan proponent, Japonica could not have solicited acceptances until a disclosure statement had been approved. 11 U.S.C. § 1125(b). Japonica's action caused discriminatory treatment among members of the same class, in violation of 11 U.S.C. § 1123(a)(4).

Those who accepted the Japonica tender offer received immediate cash. Those creditors who did not would receive their distribution at a later undetermined date, pursuant to the "official" Japonica plan. Those creditors would receive potentially more cash, but subject to an undesired holdback.

During this period, Japonica had incompatible and inconsistent roles. Japonica made an offer to purchase the claims of Class 7.AI.1. Japonica was also a plan proponent with an offer to that class. The court finds that Japonica acted in bad faith by offering to provide a settlement to a class of claimholders in the absence of a confirmed plan. By doing so, Japonica did not comply with the letter or the spirit of the Bankruptcy Code.

■ It is beyond dispute that a debtor may not pay creditors outside of a plan of reorganization. Other courts have held that such attempts were an impermissible circumvention of the Bankruptcy Code. *See Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.),* 700 F.2d 935, 940 (5th Cir.1983) ("The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan...."); *Official Committee of Equity Security Holders v. Mabey (In re A.H. Robins Co.),* 832 F.2d 299, 300 (4th Cir.1987), *cert. denied,* 485 U.S. 962, 108 S.Ct. 1228, 99 L.Ed.2d 428 (1988) ("The disbursement of such funds [to certain unsecured creditors] prior to the confirmation of a plan of reorganization ... would violate the Bankruptcy Code.")

In a prior opinion in this case, this court declared that the assignment of claims "allows a third party to do something which the debtor cannot" before confirmation of a plan because of the constraints of sections 1125 and 1129. *In re Allegheny International, Inc.,* 100 B.R. 241, 243 (Bankr.W.D. Pa.1988). Although the court was critical of the process, the court allowed the trading in claims because the purchasers of claims there were speculators who were using their own resources. Under the special facts of this case, the court cannot apply the same distinction to Japonica.

The earlier purchasers of claims were not proponents of a plan—Japonica is!

Japonica's strategic purchases of claims in strategic classes to advance the position of the proponent is not acceptable and constitutes at least bad faith, if not an unlawful act, in the pursuit of confirmation of its plan. 11 U.S.C. § 1129(a)(3).

As the above cited opinion indicated, the result would have been different if the claims purchasers had inside knowledge. Referring to the 1983 Advisory Committee Note to Rule 3001(e), the court stated that, "[w]e recognize that the cases cited therein involved breaches of fiduciary duty. A breach of fiduciary duty implies inside knowledge." *Id.* at 243. As already discussed, Japonica had vast knowledge of the most intimate details of this company unmatched by any other creditor. Japonica possessed all the knowledge of an insider.

Most important, if Japonica had made a substantially similar tender offer to this class as part of its own plan, the plan would not meet the fair and equitable test of senior classes which might reject the plan. Nor would such a plan provision meet the "best interests of creditors test" of 11 U.S.C. § 1129(a)(7)(A) if a single senior creditor objected. By providing that class with immediate cash, the plan would not be fair and equitable to other classes with higher priority who are burdened by a holdback provision. The control tactic of this tender offer itself was extremely inequitable. It placed unfair choices upon the debenture holders. It constitutes bad faith. The class of debenture holders had already voted overwhelmingly for the debtor's plan. During the Japonica disclosure hearing in open court, Fidata Trust Company New York ("Fidata"), the indenture trustee, indicated strong opposition to the Japonica plan. Fidata objected to the lower distribution compared to the debtor's plan and the holdback provisions of the Japonica plan. Further, they objected to the distribution of immediate cash to shareholders who were junior to them. It is almost certain that the "fair and equitable" standard on cram down and the best inter-

est of creditors test by a single creditor would be raised at confirmation.

Further, although the tender offer provided the immediate possibility of cash, the total amount of debentures to be purchased, if any, was not disclosed or committed. These creditors had to speculate if Japonica would only purchase a blocking position. Would there be more delay? The tender offer, if included in the plan, would not be adequate disclosure under 11 U.S.C. § 1125. The debenture class was forced to face a real dilemma—cash now, but in indefinite amounts, or more delay related to confirmation of the Japonica plan. The debenture holders were coerced into selling their claims. This constitutes bad faith.

B. *Purchase of Senior Claims in Class 4.AI.2 and 5.CH.1 by a Proponent*

Prior to the close of balloting on June 8, 1990, the insurance companies held approximately 35% of the amount of the claims in Class 4.AI.2 and rejected the Japonica plan. These negative votes precluded the confirmation of the Japonica plan. The Japonica plan offered claimants in Class 4.AI.2 87% of their pre-petition claims. When the holdback provisions are considered, the distribution could be reduced to 70%.

Pursuant to assignment agreements dated June 8, 1990 between the insurance companies and Japonica, Japonica purchased the claims of the insurance companies in Class 4.AI.2 for 93.2% of their pre-petition claim. This price was in excess of 6% more than the highest amount to be distributed under the Japonica plan and in excess of 23% more if the holdbacks are considered. Japonica paid more directly to purchase the claims than offered by their plan. This was a naked attempt to purchase votes.

The insurance companies pursuant to the assignment agreement were required to move for leave to change or withdraw their ballots. The court denied this motion.

On June 8, 1990, after purchasing these claims, Japonica also proposed a modification of their plan as it affects Class 4.AI.2, ostensibly to provide the entire class with the same benefit! This modification proposes to pay 94.86% of the pre-petition debt. Recall that earlier in this case, in March of 1990, during the balloting period on the debtor's plan, Japonica had purchased $31 million of the 7¾ Swiss Franc Notes for 66% of the pre-petition claims. These claimants are in the same class. The modification that Japonica proposes will pay back to Japonica a handsome profit on the claims that it purchased. Japonica has provided no explanation that new capital will be made available from third parties. Japonica intends to use the debtor's existing cash, assets, and debt to fund this modification. This is *chutzpah* with a vengeance. It is also bad faith.

These facts are close to those in *In re P–R Holding Corp.*, 147 F.2d at 897. In that case, two non-creditors purchased claims to ensure the success of a plan of reorganization beneficial to them. The court held that the purchase of claims "in aid of an interest other than an interest as a creditor ... may amount to 'bad faith'.... [C]ertainly there is 'bad faith' when those purchases result in a discrimination in favor of the creditors selling their interests." *See also In re Featherworks Corp.*, 36 B.R. 460, 463 (E.D.N.Y.1984) ("The other creditors, all of whom had already voted, were not similarly afforded a chance to convert their claims to immediate cash.... [T]he court does not believe that the law countenances vote trafficking and assertedly otherwise innocent self-dealing *after the votes have been cast.*")

The conduct here is even more offensive than in *P–R Holding*. Here, the sellers were members of the Creditors' Committee and they owed a fiduciary duty to other class members. The purchasers in *P–R Holding* offered to forego the benefits of the claims which they had wrongfully acquired and thereby increase the distributions to others. Here, after having committed a wrongful act, Japonica proposes to pay themselves handsomely under an outrageous view of equity. We find bad faith.

C. *Japonica Partners as a Proponent of a Plan Sought and Received Inside Information and Should be Treated as a Fiduciary and an Insider*

■ Japonica argues that they are not insiders, as that is defined in 11 U.S.C.

§ 101(30).[14] It is clear to this court that Congress intended that an insider includes "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978); H.R.Rep. No. 595, 95th Cong., 1st Sess. 312 (1979), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5810, 6269 (legislative history to 11 U.S.C. § 101(30)).

The rules of construction for the Bankruptcy Code specifically state that the terms "includes" and "including" "are not limiting." 11 U.S.C. § 102(3). The use of the term "insider" at 11 U.S.C. § 101(30) provides an illustrative, rather than an exhaustive list of the persons or entities which may qualify as insiders of the debtor. *In re Henderson*, 96 B.R. 820, 824–25 (Bankr.E.D.Tenn.1989).

As a proponent, Japonica sought an order of court to conduct "due diligence" which it needed to obtain bank financing to implement its plan. Japonica had complained that the debtor was not cooperative and that the additional data was required to confirm the public information which Japonica already possessed. This due diligence would be accomplished over a period of time as short as seven days. Transcript, January 25, 1990, at 243; Transcript, March 2, 1990, at 16, 101, 103, 105–106, 143.

A very different story was developed at trial. The testimony of F. Ann Ross–Ray, Esq., was clear, definite and compelling. Over a three-month period, from March 16, 1990 to approximately June 11, 1990, Lederman, Paul B. Kazarian, and William Webber, along with their associates, requested and received the full cooperation of the debtor in obtaining information. It is clear that they received a great volume of information that was not available to other creditors, shareholders, and the general public. This delivery of information was voluminous and thorough. This type of information is available only to insiders. At first Japonica dealt only with Ross–Ray; later they grew bolder and went directly to employees to obtain information they desired.

It is true, as Japonica argues, that they did not have actual control or legal decision making power. However, it is also true that they attempted to influence, in not very subtle ways, decisions made by the debtor. This was especially so when they regarded the decisions as important to their possible future administration. For example, they became deeply involved in the debtor's insurance coverage and the disposal of certain assets.

The testimony of Lewis U. Davis, Jr., Esq., was also clear and convincing. The debtor desired to prevent a loss of value to the enterprise and to provide for an orderly transition in the event that Japonica obtained control under Japonica's plan or under the debtor's plan. The debtor cooperated far beyond the requirement of the March 15, 1990 Order.

Davis testified that on or about June 11, 1990, after the insurance claims had been purchased, Lederman, in the name of Japonica, demanded that a principal of Japonica, Paul B. Kazarian, be named chairman of the board of directors of the debtor, and that Lederman, the other principal, be appointed general counsel and chief administrative officer. Lederman further demanded that Milligan be made to resign so that he could be replaced by Webber, Japonica's designee. Japonica caused to be issued press releases announcing that it now controlled the debtor. Under the pretext of performing due diligence, it is clear that Japonica exploited its special access to information, personnel and the premises of the debtor to attempt to assert its influence and control. Japonica's actual behavior was a breach of this court's order and of bankruptcy principles. In addition, it was

---

**14.** Section 101(30) in pertinent part, provides that " 'insider' includes ...
   (B) if the debtor is a corporation—
     (i) director of the debtor;
     (ii) officer of the debtor;
     (iii) person in control of the debtor;
     (iv) partnership in which the debtor is a general partner;
     (v) general partner of the debtor; or
     (vi) relative of a general partner, director, officer, or person in control of the debtor ..."

disquieting, rude, overbearing and disruptive of employee-management relations.

Japonica sought and received inside information as a proponent of a plan. This court finds as a matter of fact that Japonica is an insider and a fiduciary for purpose of this reorganization.

In addition, the banks urge the court to find Japonica to be in violation of the automatic stay. 11 U.S.C. § 362(a)(3). The debtor has promptly remedied these events by denying Japonica's demands, evicting them from the office space at the debtor's headquarters, and limiting their access to information to written requests. Japonica may have also caused employee relationships to be harmed, but those issues are left for another day, should these events contribute to this plan not being consummated.

The following incident is also illustrative of Japonica's new-found arrogance. At a telephone conference on June 21, 1990, after the close of balloting, Japonica refused to make the results of the balloting available to creditors, even though Japonica had promised to do so and even though Japonica had been receiving the daily results from the entity tabulating the ballots. At the confirmation hearing on June 28, 1990, dramatically at 10:00 A.M. the courtroom door opened and the results were revealed. This behavior illustrates the arrogance with which Japonica and their attorneys have treated the court, and it lends credence to the testimony of Davis and Ross–Ray.

The court finds that Japonica has engaged in a pervasive pattern of bad faith designed to control the debtor and manipulate the bankruptcy process. Its actions are a clear violation of the purposes of chapter 11. All of the above actions of Japonica provide this court with ample grounds to impose restraints and sanctions.

### D.  The Purpose of Chapter 11 Versus Control Profit

A noted commentator suggests that the ultimate intent of bankruptcy is to maximize results for all creditors:

The basic problem that bankruptcy law is designed to handle, both as a normative matter and as a positive matter, is that the system of individual creditor remedies may be bad for the creditors as a group when there are not enough assets to go around. Because creditors have conflicting rights, there is a tendency in their debt-collection efforts to make a bad situation worse. Bankruptcy law responds to this problem.

. . . . .

Bankruptcy provides a way to make these diverse individuals act as one, by imposing a *collective* and *compulsory* proceeding on them.

. . . . .

This is the historically recognized purpose of bankruptcy law and perhaps is none too controversial in itself.

T. Jackson, *The Logic and Limits of Bankruptcy Law*, 10–13 (1986). The purpose of reorganization is to offer an opportunity to maximize results for all creditors and interest holders. Japonica's actions and statements make abundantly clear that it is "control" and "control profit" that they seek. This control profit will not be shared through a reorganization plan with all creditors and all interest holders. A control profit will be shared by only Japonica and their affiliates. Japonica intends to use its newly acquired control to extract economic profit for itself, not to maximize the results for all creditors.

Trading in claims to achieve profits on a specific claim may not be destructive of the reorganization process (a) when both buyer and seller are informed; (b) when the purchaser is willing to hold the claim until distribution; and, (c) when the original claimant does not wish to hold the claim or needs immediate cash. However, the technical provisions of the Code, such as the automatic stay, are designed to achieve the purposes of the reorganization process and to maximize results for all creditors. These provisions are not designed to create delay and pressure claimants to sell. Delay reduces the value of claims. Japonica has deliberately created delay which has improved their ability to buy claims.

The confirmation process enables creditors to modify themselves. The purpose is to increase the pool of value for all creditors and shareholders. Here, Japonica clearly attempts to deprive creditors of the control premium by a manipulation of the reorganization process through the strategic purchase of claims. Acquiring claims with the clear purpose of achieving control of the debtor, thereby earning a control profit, does not maximize the result for all creditors. Such action manipulates the process.

### E. *The Control Provision*

■ As a result of the negotiations with various constituents prior to the filing of the debtors' plan, the debtor included a provision in the Certificate of Incorporation of Sunbeam/Oster Companies, Inc., that would ensure that any premiums paid to acquire control of the debtor would be shared with all stockholders. *See* Debtor's Joint Stock Plan of Reorganization, Exhibit A. Many creditors feared that banks would use their position as the largest stockholder to control the reorganized debtor.

The Control Transaction provision, contained in Article Sixth of the Certificate of Incorporation, states that in the event of a Control Transaction any time during the period ending two years after the effective date, any holder of common stock of the corporation may "put" his or her shares to the "Controlling Person" (i.e., demand that the Controlling Person purchase those shares) prior to or within forty-five days after certain notice requirements are met.

A Controlling Person means "any person who has or has the right to acquire, or any group of persons acting in concert for purposes of voting their shares that has or has the right to acquire, voting power over shares of Common Stock of the Corporation that would entitle the holders thereof to cast at least 30% of the votes that all Holders of Common Stock would be entitled to cast in an election of directors...." *Id.* The definition of Controlling Person excludes inter alia any person who received common stock pursuant to the plan "unless either (x) such person acquires additional shares of Common Stock for the actual purpose of exercising control over the Corporation, or (y) in any event, such person acquires beneficial ownership *in excess of 45% of the Common Stock of* the Corporation." *Id.* (emphasis added).

We find that in the event that such shares are "put" to the Controlling Person, the Controlling Person is required to pay to such holder an amount equal to the highest per share price paid in acquiring any share of common stock beneficially owned (after the Effective Date and before the end of the forty-five day period) by the Controlling Person. Thus, any premium price paid for control must also be shared with other stockholders. The consideration to be paid to such holders of common stock who "put" their shares to the Controlling Person shall be in cash or the same form as was previously paid in order to acquire shares of common stock which are beneficially owned by the Controlling Person. The Control Transaction provision further provides that, to the extent shares of common stock beneficially owned by the Controlling Person were acquired as a result of distributions under the plan, such shares will be deemed to have been acquired with cash.

Japonica's objections to these provisions, as a matter of law, have little merit. First, Japonica complains that the warrants to be issued to holders pursuant to the plan are counted for purposes of determining whether a person meets the threshold requirement for being deemed a "Controlling Person." Then Japonica objects that neither the exclusion for shares issued pursuant to the plan of reorganization nor the definition of Control Transaction contains an exception for shares purchased on the exercise of the warrants issued pursuant to the plan. Japonica believes that the exercise of warrants issued for purchase of common stock could give rise to an obligation to allow all other shareholders in the corporation to "put" their shares to a Controlling Person. This is not an accurate interpretation of the Control Transaction provision.

This provision provides that at all times the warrants are to be counted for the purposes of determining whether a person is a Controlling Person. However, once the warrants have been exercised, they do not exist and the new stock is counted in the place of the previous warrants. For example, if a stock and warrant holder is determined to own 29% of the company, 9% of which is in the form of warrants and later such person exercises all 9% of those warrants to purchase shares of common stock, such shares of common stock would be counted in the place of the warrants and that person would continue to be viewed as owning 29% of the company.

Japonica also objects that "[t]he Control Transaction provisions may result in different treatment for creditors in the same class," in violation of 11 U.S.C. § 1123(a)(4). There is nothing in the Control Transaction provision that will result in different treatment to creditors within the same class. Japonica uses the example of a creditor in Class 7.AI.1 who holds significant claims in that class as well as claims in other classes, so that the creditor holds warrants and stock sufficient to meet the threshold for causing such person to be deemed to be a Controlling Person. It should be noted that at the time of the hearing on the debtor's disclosure statement in January 1990, and at the end of balloting, there was no creditor that would have received, under the provision in which shares and warrants were to be counted, beneficial ownership in excess of 45% of the common stock of the corporation. Since that time, Japonica has voluntarily purchased claims in various classes which are to receive stock and warrants.

Japonica also objects, at ¶¶ 23–24 of their supplemental objections, to the effect that the Control Transaction provision would have on holders of claims in Class 2.AI.2, the Allegheny Secured Bank Claims. Evidently at the time this objection was raised, Japonica knew that when it completed its plan to purchase claims, it would have acquired a significant amount of claims in Class 7.AI.1 which, after distribution, would be counted with Japonica's holdings at Class 2.AI.2 and Class 4.AI.2, the Alle-gheny Senior Unsecured Claims. It is clear that Japonica understood and correctly feared the effect that the Control Transaction provision would have on their attempt to control the debtor by this means. The court and other creditors did not appreciate Japonica's concern because they did not know of Japonica's intent. These objections raised by Japonica to the Control Transaction provision are not well-founded.

Actually, Japonica objected to the debtor's plan before it had purchased enough claims to trigger the Control Transaction provision. It appears that its intent to breach that provision may have been long formed. From written and oral objections at the hearing on the debtor's disclosure statement, it is clear that Japonica knew of the intent of these provisions in advance of their claims purchases and accepted the risk that these control provisions could be applied to them.

Japonica has indicated it will not observe the control provisions of the debtor's plan. The banks ask that those provisions be enforced. This court believes it is appropriate to enforce the control provision for at least three reasons. First, because the court believes that the provisions are enforceable under both Pennsylvania and Delaware law; second, because they are separately enforceable as part of the debtor's plan of reorganization which has been approved by the requisite classes; and, third and most important, Japonica's inequitable and bad faith behavior, found above, requires that the intent and substance of these control provisions be enforced as a sanction upon Japonica.

The court intends to mold an injunction to carry out the intent of these control transaction provisions on Japonica by at least denying Japonica's right to vote their shares, unless forty-five days from the date of this confirmation order, Japonica indicates the ability and the agreement to accept the "puts."

F. *Section 105 and the Inherent Powers of a Bankruptcy Court Provide the Necessary Power to Grant Orders for Appropriate Relief*

Justice Douglas wrote eloquently about the equity powers of a bankruptcy court:

'A court of equity may ... in the exercise of the jurisdiction committed to it grant or deny relief upon performance of a condition which will safeguard the public interest.' ... These principles are a part of the control which the court has over the whole process of formulation and approval of plans of composition or reorganization.... The responsibility of the court entails scrutiny of the circumstances surrounding the acceptances, the special or ulterior motives which may have induced them, the time of acquiring the claims so voting, the amount paid therefor, and the like.

.        .        .        .        .

Where such investigation discloses the existence of unfair dealing, a breach of fiduciary obligations, profiting from a trust, special benefits for the reorganizers, *or the need for protection of investors against an inside few, or of one class of investors from the encroachments of another, the court has ample power to adjust the remedy to meet the need.* The requirement of full, unequivocal disclosure; the limitation of the vote to the amount paid for the securities (citation omitted); the separate classification of claimants (citation omitted); the complete subordination of some claims (citations omitted), indicate the range and type of the power which a court of bankruptcy may exercise in these proceedings. *That power is ample for the exigencies of varying situations.* It is not dependent on express statutory provisions. It inheres in the jurisdiction of a court of bankruptcy.

*American United Mut. Life Ins. Co. v. City of Avon Park*, 311 U.S. 138, 145–46, 61 S.Ct. 157, 161–62, 85 L.Ed. 91 (emphasis added) (quoting *Securities and Exchange Commission v. United States Realty & Improvement Co.*, 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940)); *see also Young v. Higbee Co.*, 324 U.S. 204, 214, 65 S.Ct. 594, 599–600, 89 L.Ed. 890 (1945) ("Courts of bankruptcy are courts of equity and exercise all equitable powers unless prohibited by the Bankruptcy Act."); *Pepper v. Litton*, 308 U.S. 295, 307–08, 60

S.Ct. 238, 245–46, 84 L.Ed. 281 (1939) ("In the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estate.") Bankruptcy courts may "look through the form to the substances of any particular transaction and may contrive new remedies where those in law are inadequate." *State of Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 436 (6th Cir.1982) (quoting 1 *Collier on Bankruptcy*, ¶ 2.09 (14th ed. 1974)). Thus, the court faced with the unusual situation in this case has "ample power" to formulate appropriate remedies.

The court's equity powers are codified at section 105 of the Bankruptcy Code, 11 U.S.C. § 105. That section empowers the court to "issue any order, process, or judgment necessary or appropriate to carry out the provisions of" the Bankruptcy Code and is an extremely broad grant of authority to do what is necessary to aid its jurisdiction over a bankruptcy case. 2 *Collier on Bankruptcy* ¶ 105.02 (15th ed. 1981).

For example, in *In re Gaslight Club, Inc.*, 782 F.2d 767, 770 (7th Cir.1986), the court recognized that section 105's grant of power included "considerable authority to interfere with the management of a debtor corporation in order to protect the creditors' interests." Numerous other decisions are in accord. In *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17–18 (Bankr.S.D.Ohio 1983), the court, upon finding that "best interests of creditors" would not be served by allowing a new slate of officers who were inexperienced to take over day-to-day operations, ordered the board of directors not to interfere with existing management.

In *In re Alrac Corp.*, 1 Bankr.Ct.Dec. 1504 (CRR) (Bankr.D.Conn.1975), a case under the former Bankruptcy Act, the court enjoined stockholders from calling an annual meeting pending consummation of a plan. The plan provided for the issuance of new common shares to creditors, who would then be able to elect new directors. The annual meeting had "the potential of possible interference with consummation of

the arrangement if an administration 'unfriendly' to the creditors were installed. This would clearly be inconsistent with the program envisioned in the plan and accepted by creditors and should be restrained." *Id.* at 1506. In the instant case, the creditors did not vote for a plan that would defeat the control provision and impose minority status upon them.

In *In re Johns–Manville Corp.*, 66 B.R. 517 (Bankr.S.D.N.Y.1986), the bankruptcy court enjoined a suit by the equity committee in Delaware state court to compel a shareholders' meeting at which new directors would be elected. The equity committee members had envisioned the election of new directors who would oppose a consensual reorganization plan that had been developed. The court adhered to this result upon remand from the Second Circuit, which had held that because of the importance of the right to a shareholders' meeting to elect new directors under state law, that right could only be overridden by a "showing of clear abuse" and irreparable injury. *In re Johns–Manville Corp.*, 801 F.2d 60, 64 (2d Cir.1986). Such abuse by Japonica has been shown in the findings of the court outlined above.

Moreover, in *Johns–Manville Corp.*, the need to appoint a trustee or to liquidate in chapter 7, with disastrous consequences, loomed as distinct possibilities. *Id.* at 537–39. That is a possible consequence in this case also.

In addition, bankruptcy courts have used their equitable powers under section 105 to "assure the orderly conduct of the reorganization proceedings," *In re Baldwin–United Corp. Litigation*, 765 F.2d 343, 348 (2d Cir.1985); to prevent activities which would delay or thwart efforts to reorganize the debtor, *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1008 (4th Cir.1986), *cert. denied*, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); and to block actions which tend to "defeat or impair its jurisdiction." *In re Wingspread Corp.*, 92 B.R. 87, 92 (Bankr.S.D.N.Y.1988).

■ Equitable relief under section 105 also is appropriate to prevent "end runs" on the bankruptcy process. For example, the "power to enjoin assures that a creditor may not do indirectly that which he is forbidden to do directly." *In re Otero Mills, Inc.*, 21 B.R. 777, 778 (Bankr.D.N.M.), *aff'd*, 25 B.R. 1018 (D.N.M.1982). Japonica has done indirectly what they could not do directly.

■ Japonica has interfered with management and attempted to seize control of the debtor. Japonica has abused and manipulated the bankruptcy process. Japonica has unilaterally resorted to out-of-court measures to impose its will upon the debtor and creditors in a manner not permitted by the Code. Japonica's actions are a grave threat to the prospect of prompt and successful reorganization.

This court is compelled by the facts and by the purpose of bankruptcy reorganization and the law to grant equitable relief in the instant case. Historically, in response to this kind of conduct, bankruptcy courts have granted a wide range of relief. However, in the use of this broad power, this court will exercise only such power as will accomplish the objective of the reorganization consistent with the intended provisions of the plan and disclosure statement and on the basis on which the plan was accepted.

Shares to be distributed to Japonica or their affiliates shall be held in trust by the debtor and shall not be entitled to vote on any matter while in trust or owned by Japonica. Japonica, however, may enjoy the other benefits of ownership, such as dividends and proceeds from sale. If, within 45 days from the date of this order, and subject to approval by this court, Japonica establishes with the debtor that it has the ability to respond to puts from all other shareholders and warrant holders at $7.00 per share and $1.53 per warrant, then the debtor and Japonica are to facilitate the purchase transaction and an orderly change in control. If, within 45 days, Japonica does not agree, or does not establish its ability to accept the put of shares and warrants, then the trust of its shares shall continue for three years. Japonica may choose to continue to own the shares or may set in motion with the cooperation of the reorganized debtor and the consent of

this court an orderly sale of such shares to parties who consent to the Control Transaction provision.

The remedies this court has selected do not deny at this time the bargain Japonica may have achieved on its trading in claims. The remedies are designed to deny control and the control profit through the denial of the voting power of those shares.

## III. VALUATION AND CRAMDOWN

■ The equity holders in this case consist of three classes, which follow in the order of priority: Class 8.AI.1, the $2.19 preference shares; Class 8.AI.2, the $11.25 preferred shares; and, Class 9.AI.1, the common shares. Under the plan of reorganization, all three classes are impaired. Those classes are to receive warrants.[15] Class 8.AI.1 and Class 9.AI.1 accepted the plan; Class 8.AI.2 rejected the plan.

Section 1129(b) of the Bankruptcy Code, 11 U.S.C. § 1129(b), empowers the court to confirm a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more classes of creditors or interest holders. In bankruptcy jurisprudence, this process is known as "cramdown." To cram down a plan on a dissenting class, the court must determine that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). With respect to a dissenting class of interests, a plan is fair and equitable if the following requirements are satisfied:

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation

preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129(b)(2)(C). Paragraph (ii) of the above quoted section is a restatement of the absolute priority rule.

Because Class 8.AI.2, the preferred shares, was the only nonaccepting class of interests, that class "must receive the reorganization 'value of their interest,' or junior interests must be cancelled." 5 Collier on Bankruptcy ¶ 1129.03[4][e] (15th ed. 1989). To determine whether Class 8.AI.2 may be forced to accept the plan and to determine whether Class 8.AI.2 has received a proper distribution as the value for their interest before Class 9.AI.1 can participate in the distribution, the court must determine the value of the securities to be issued.

### A. *Valuation*

The court heard extensive testimony on valuation as part of the confirmation hearings. The debtor directed its financial advisor, Smith Barney, Harris, Upham & Co. ("Smith Barney") to prepare a valuation of the reorganization securities. Smith Barney also prepared, at the direction of the debtor, a valuation analysis of the debtor's operating businesses to be used in a liquidation analysis. A summary of this valuation appears in the debtor's disclosure statement. Smith Barney estimated that the enterprise value of the debtor ranged from $510 million to $570 million and the liquidation value of the operating business-

---

**15.** Section 7.16 of the plan of reorganization provides that if any class of equity holders rejects the plan, then that class and any junior class would not receive any distribution. The warrants intended for those classes would be distributed to Class 7.AI.1. Thus, under section 7.16 of the plan, Class 8.AI.2 and Class 9.AI.1 are not entitled to any distribution. However, section 7.16 also provides that if the court "finds that the foregoing Distributions are not permit-

ted under the Bankruptcy Code then the 'absolute priority' rules of Bankruptcy Code Section 1129(b) shall be followed."

The court finds section 7.16 discriminatory. Moreover, as the Equity Committee points out, there is no authority in the Bankruptcy Code for discriminating against classes who vote against a plan of reorganization. Therefore, the absolute priority rule shall be followed.

es ranged from $510 million to $550 million. The resultant values of the reorganization shares were $6.33 to $7 per share of the new common stock and zero to $1.53 for the warrants.

At the confirmation hearing, Robert C. Martin, the Managing Director of the Financial Restructuring Group at Smith Barney, testified for the debtor about the valuation process his firm conducted.[16] Martin testified that Smith Barney, inter alia, reviewed public financial statements, analyzed financial and operating data, prepared discounted cash flow analyses, analyzed individual operating businesses, considered comparable companies that were publicly traded, considered comparable mergers and acquisitions, considered economic and industry data, interviewed senior management, reviewed the stock plan, and performed various other analyses. In addition, Smith Barney considered the results of the extensive solicitation of prospective purchasers of the debtor's businesses, which occurred in August 1988. Smith Barney had conducted that solicitation process and thus was intimately familiar with it.

Smith Barney calculated the net income valuation by taking the debtor's projected net income for the next three years, applying an "appropriate" predetermined multiplier, reducing the results to present values as of March 31, 1990, and dividing by the number of shares to be issued to arrive at the price range per share.

As part of its analysis, Smith Barney thoroughly reviewed six other appliance companies which it considered to be comparable to the debtor. As a part of its analysis, Smith Barney determined the appropriate multiples based on market capitalization and based on adjusted market value. For market capitalization, the multiple was the price-earnings ratio, which ranged from 10.2 to 13.3. For the adjusted market value, the range of multiples for earnings before interest and taxes ("EBIT") was 5.0

to 14.4; the range of multiples for earnings before interest, taxes, depreciation, and amortization ("EBITDA") was 4.6 to 9.7.

Martin further testified that the appropriate multiple for the net income valuation, based on the multiples for the comparable companies and other factors, was 11.-5, which was approximately the mid-point for the comparable companies. Based on the debtor issuing 45 million shares of stock,[17] Smith Barney determined the net income valuation by multiplying the projected earnings for 1991, 1992, and 1993 ($40.8 million, $49.6 million, and $59.5 million, respectively) by 11.5. The product of that calculation was $469.2 million for 1991, $570.4 million for 1992, and $685.4 million for 1993. Those amounts were then reduced to their present value as of March 31, 1990. Smith Barney thought it appropriate to apply a discount factor because of the following factors: the debtor was in a turnaround situation that involved certain unique risks, the debtor had used aggressive projections of sales and income and there were risks of failing to meet such projections, the debtor had failed to meet past projections, the risk the market would apply to securities of an appliance manufacturer emerging from bankruptcy, the return that investors seek for such risk, the return investors may receive in other turnaround situations, the return on leveraged buy-outs, and the possibility that the stock may not be well received in the marketplace. In light of all of these special factors, Smith Barney determined that the appropriate discount rate to determine present value was 25% or 30%. When this rate was applied, it resulted in the stock having a range of value from $5.73 to $7.32.

Martin testified that Smith Barney also performed the above analysis for earnings before interest and taxes. Smith Barney used a multiple of 7.5; the range of multiples for comparable companies was 5.0 to 9.4. Using the same discount factor, the price per share ranged from $6.44 to $7.81.

**16.** Over the objection of the Equity Committee, the court qualified Martin as an expert witness.

**17.** The debtor anticipated issuing more shares of stock, but improved cash flow increased the cash available for distribution, thus reducing the number of shares to be issued.

The debtor also adduced the testimony of John Mueller, a vice president of Whitman, Heffernan, Rhein & Co. ("Whitman Heffernan"), the former investment banker for the Equity Committee.[18] Mueller testified that he carefully reviewed the methodology of Smith Barney, opined that the procedures Smith Barney used were proper, and concurred with Smith Barney's valuation.

James Burroughs, a vice president and the manager of the Industrial Organization Group of Charles River Associates ("CRA"), the Equity Committee's current investment banker, and Peter Butler, senior financial consultant to CRA, testified for the Equity Committee. Burroughs testified that CRA valued the debtor by using a discounted cash flow analysis, and that such analysis resulted in a valuation between $723.5 million and $793.2 million. Burroughs testified that the discounted cash flow analysis involves three components: forecasting the cash flow of the debtor for a reasonable period; determining the cash flow for the "residual" or "terminal" value—the point after the projection period when it is assumed that no further changes will occur; and, selecting an appropriate discount rate. CRA's calculations were based on the debtor's forecasts of cash that were set forth in the disclosure statement. Both experts used the debtor's projections as shown on the disclosure statement. Burroughs believed that the discounted cash flow method was the superior method of valuation because the only source of value of an asset to its owner is the cash that the owner can attain from that asset.

Butler's testimony involved further criticism of Smith Barney's methods. He opined that earnings before interest, taxes, depreciation and amortization was a superior method to earnings before interest and taxes. He further opined that Smith Barney undervalued certain non-operating losses and the debtor's foreign subsidiaries.

This later criticism did not appear to be well founded.

There is economic authority to support the valuation methods of Smith Barney and CRA. The court qualified both Martin and Burroughs as expert witnesses, and found them both credible. Moreover, the basic approaches of Smith Barney and CRA were more alike than dissimilar. However, the court adopts the valuation of Smith Barney. There was a major weakness in CRA's analysis. To reach the conclusion that the reorganization stock would trade at $12 per share, Burroughs used a discount rate for present value of only 13.4%. Burroughs did not fully consider the possibility that the debtor would fail to meet its forecasts. Further, they made no provision for the market attaching a speculative quality to the debtor's ability to achieve its projections. It is undisputed that the debtor has consistently failed to meet its projections prior to and since the filing of bankruptcy. Burroughs theorized and presented some evidence that the new reorganized stock would perform better than the market. Burroughs used a "beta" value, the measure of the riskiness of the enterprise being valued relative to the stock market as a whole,[19] of .73 to 1.07, depending on the year. CRA determined the beta for the debtor by examining the betas of the companies which it considered comparable. However, CRA failed to establish that the beta values upon which it relied would be applicable to the debtor's projections. The factors it utilized were the actual results of companies which were successful. The uncertainty of a successful turnaround is still present.

B. *Cram Down and Exclusion of Equity Holders from the Management of the Reorganized Debtor*

Based on Smith Barney's valuation, there is insufficient value for distribution to all of the equity interests. At the time the

---

**18.** For reasons that are not in the record, the Equity Committee terminated the services of Whitman Heffernan.

**19.** For example, if a stock goes up twice as much as the stock market when the market goes

up, and down twice as much when the market goes down, it has a beta of two. If the stock moves in synchrony with the market, it has a beta of one.

disclosure statement was approved, claims against the estate were over $722 million. The debtor has since reduced claims to approximately $711 million and continues to reduce the claims through negotiation or litigation. Even so, Smith Barney has estimated the value of the debtor as $510 million to $570 million. Therefore, there is insufficient value to satisfy all creditors and interest holders. Under the absolute priority rule, Class 9.AI.1 would not be entitled to a distribution. The plan could be crammed down by diverting the value intended for Class 9.AI.1 to Class 8.AI.2.

In light of Smith Barney's valuation and the amount of outstanding claims, a cramdown on any class of equity appears to be an academic discussion. There is insufficient present value to satisfy all claims of creditors. The class of creditors with the lowest priority, Class 7.AI.1, will receive part of its distribution in warrants, which, as Smith Barney concedes, may have zero value. However, Smith Barney's (and CRA's) valuation did not value the bank litigation. The Equity Committee is a party to that action and shareholders could potentially benefit. The plan of reorganization proposes and requires the settlement of that litigation. One of the reasons the equity classes were offered warrants was to reduce all litigation. It is clear that absent the bank litigation there would be no value to distribute to equity. As a quid pro quo for settling that suit and for reducing litigation, interest holders were offered warrants. Pursuant to a simple cram down, Class 9.AI.1 is not entitled to any distribution. However, Class 9.AI.1 is entitled to receive warrants, in return for the settlement of the bank litigation.

Among their objections to confirmation of the plan, the Equity Committee complains that various provisions of the plan of reorganization violate 11 U.S.C. § 1123(a)(7). That provision provides that the plan of reorganization "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor...." As discussed at length above, there is insufficient enterprise value to allow a distribution to the equity holders, other than the warrants. Because present equity holders will not obtain stock in the reorganized debtor, it is not unfair to exclude present equity holders from selecting directors of the reorganized debtor or participating in the committee overseeing the reorganized debtor. When their warrants are exercised for shares, they will receive appropriate rights as shareholders.

## IV. OTHER OBJECTIONS TO CONFIRMATION

The plan of reorganization proposes, inter alia, to settle the adversary action by the Creditors' Committee and Equity Committee against the secured bank lenders, at Adversary No. 88–186. The Equity Committee objects to the settlement.

The Equity Committee also objects to the payment of interest to creditors in Class 5.SB.7. In a related matter, Cowen & Company ("Cowen") and Amroc Investments, L.P. ("Amroc") object to the nonpayment of interest to creditors in Classes 5.SB.1 and 5.AL.1.

The court must also respond, in the context of an objection to confirmation, to the matters raised by Japonica and the Equity Committee in their motions to designate.

Finally, Elliott Associates, L.P. ("Elliott") objects to its treatment under the plan of reorganization. The court will address these issues seriatim.

### A. Specific Findings of Fact and Conclusions of Law On the Settlement of Adversary Proceeding No. 88–0186 and Its Inclusion in the Debtor's Plan

#### 1. History of the Litigation

Immediately following the first petitions for relief in February 1988, AI, in the exercise of its business judgment, entered into an Adequate Protection Agreement with the consortium of 26 banks who were the debtor's pre-petition lenders (the

"banks").[20] In the agreement, AI agreed not to commence any action against the banks and recognized that the banks' liens were valid. This court approved the agreement and in a Memorandum Opinion dated March 11, 1988 expressly permitted AI to recognize the validity of the banks' liens, without prejudice to the rights of other constituents to raise and contest the validity of these liens. In May 1988, the Creditors' Committee commenced an action containing eleven counts on behalf of AI against the banks, at Adversary No. 88–186.

The complaint alleges that the banks are liable to AI for (i) fraudulent transfers under state and federal law, (ii) preferential transfers to alleged insiders, (iii) equitable subordination, and (iv) breach of a duty to act in good faith and deal fairly. The relief sought includes (a) return of $400 million paid to the banks prior to the bankruptcy filing; (b) invalidation or subordination of the banks' remaining liens which collateralize the approximately $220 million remaining to be paid; (c) punitive damages of $880 million; (d) return of a $500,000 fee paid to the banks in December 1986 in connection with the postponement of the due date of a periodic payment; (e) return of other fees and reimbursement for interest, costs and counsel fees; and, (f) such other relief as the bankruptcy court deems appropriate.

The banks have denied the allegations of the complaint, and asserted various affirmative defenses. Upon the motion of the Equity Committee, this court granted the Equity Committee the right to intervene, but only with respect to Counts X and XI. *Official Committee of Unsecured Creditors of Allegheny International, Inc. v. Mellon, Bank, N.A. (In re Allegheny International, Inc.)*, 93 B.R. 903 (Bankr.W. D.Pa.1988), *rev'd in part*, 107 B.R. 518 (W.D.Pa.1989). On appeal, the district court on November 15, 1989 granted the Equity Committee the general right to intervene on all counts. The banks have

appealed the intervention order. The Equity Committee did not file a separate complaint but adopted the pleadings of the complaint as filed by the Creditors' Committee and has not sought to amend or supplement those pleadings.

Very early in this case the court recognized that this litigation would have a crucial role in the bargaining related to any plan of reorganization. When the debtors decided not to pursue these causes of action, this court invited the Creditors' Committee to pursue them. Even so, this court has held that the causes of action asserted in this complaint are derivative in nature. *Id.* On July 12, 1988 the banks successfully moved to compel joinder of the debtor as a party defendant. This court said, "[b]ecause we view this case as a derivative action, we will grant the Mellon group's motion to compel joinder." *Id.* at 905. It is not disputed that a derivative action is a suit to enforce a corporate cause of action. *See also Price v. Gurney*, 324 U.S. 100, 105, 65 S.Ct. 513, 516, 89 L.Ed. 776 (1945). After October of 1988, the parties have not disputed the derivative nature of the complaint in the bankruptcy court.

On October 10, 1989, the banks moved for partial judgment on the pleadings and for partial summary judgment dismissing Counts X and XI. Those counts assert theories of equitable subordination and breach of duty of good faith and fair dealing, respectively. The banks argue that Count X should be dismissed as to the Equity Committee as a matter of law because 11 U.S.C. § 510(c) does not permit the subordination of a creditor's claim to an equity holder's interest. The banks further argue that both Counts X and XI are insufficient as a matter of law and on the facts and should be dismissed.[21]

### 2. The Settlement

After many months of extensive discovery and negotiations, a settlement of the litigation has been proposed as an inte-

---

**20.** Mellon Bank, N.A. was the agent for the consortium.

**21.** The banks have submitted affidavits of the senior management of AI in support of their motion for judgment as to those counts.

gral part of the debtor's plan (and as a part of the rival Japonica plan). The negotiations were conducted between the Creditors' Committee, which was advised by its special counsel and regular counsel, and the banks and their counsel. The negotiating parties had the benefit of input from the debtor and debtor's counsel regarding a range of settlement terms. However, the Equity Committee does not join in the settlement. Because this litigation has been clearly adversarial, the court is satisfied that the negotiations were conducted entirely at arm's length.

The settlement provides for (1) the litigation to be dismissed with prejudice, (2) the debtor to indemnify the banks to the extent of $3 million for claims arising out of or relating to the loan transactions, and (3) the delivery by AI to the banks of a general release. In return, the banks have agreed to forego the following claims: (a) approximately $39 million of their $57 million claim for post-petition interest accrued as of February 28, 1990; (b) all post-petition interest accruing thereafter at a rate of approximately $2 million per month; and, (c) all costs of defense for this action, for which they would otherwise seek payment pursuant to the terms of their credit agreements with AI.

It is clear that this settlement is an integral part of the debtor's plan of reorganization. Consummation of the settlement is conditioned upon confirmation of the plan, and similarly, confirmation of the plan is a condition upon consummation of the settlement.

The proposed settlement includes the following benefits: (1) significant monetary concessions by the banks; (2) the elimination of substantial expenses to the estate that otherwise would be incurred if the litigation continued through trial and subsequent appeals; (3) the elimination of the risk of a verdict unfavorable to plaintiffs if the litigation should proceed to trial; (4) the substantial limitation of claims by the banks for post-petition interest and litigation fees if they are successful in their defense; and (5) the ability to proceed with

the reorganization without the risk of delay arising from the litigation.

The settlement has the support of the debtor, the Creditors' Committee and the banks. It is very significant that the class of common stockholders, 9.AI.1, and the preferred stock class, 8.AI.1, have voted in favor of the plan, thereby signifying their approval of the settlement as well. One of the classes of preferred stock, Class 8.AI.1, voted 58% in favor, although this does not constitute acceptance under 11 U.S.C. § 1126(c). Absent bankruptcy, a simple majority of a class has some weight.

It is clear to the court that this settlement is of great benefit to the estate, the creditors, and equity holders.

### 3. Standards for Approval of Settlement in Bankruptcy

The Bankruptcy Code, 11 U.S.C. § 1129(a)(1), provides that a plan may be confirmed only if it complies with the provisions of Title 11. A plan may provide for compromise of litigation. 11 U.S.C. § 1123(b)(3)(A). Even when an impaired class of claims or interests does not accept the plan, the court may approve the settlement and the plan if the court determines that the plan is fair and equitable to those impaired classes. 11 U.S.C. § 1129(b)(1).

This court has discretion to approve a settlement as part of a reorganization plan. Even so, there are limits to a court's discretion in approving a settlement. This court is guided by the case law which teaches that a compromise should be approved if it is fair and equitable. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968); *In re AWECO, Inc.,* 725 F.2d 293, 298 (5th Cir.), *cert. denied,* 469 U.S. 880, 105 S.Ct. 244, 83 L.Ed.2d 182 (1984); *In re Texaco, Inc.,* 84 B.R. 893, 901 (Bank.S.D.N.Y.1988). The court must reach an "informed, independent judgment" supported by the factual background underlying the litigation and bankruptcy. *Texaco,* 84 B.R. at 901.

The courts that have addressed this problem are in substantial agreement as to the

factors a bankruptcy judge must consider in evaluating a settlement. As stated in *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 390, 395 (Bankr.E.D.Pa.1987), the factors are "(a) [t]he probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views...." *See also In re American Reserve Corp.*, 841 F.2d 159, 161 (7th Cir. 1987); *In re A & C Properties*, 784 F.2d 1377, 1382 (9th Cir.1986), *cert. denied*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed.2d 122 (1986); *In re Energy Cooperative*, 886 F.2d 921, 927 (7th Cir.1989). A further consideration, enunciated by the Supreme Court in *TMT Trailer* is "the need to compare the terms of the compromise with the likely rewards of litigation." 390 U.S. at 425, 88 S.Ct. at 1163.

The court in *In re Texaco* followed *TMT Trailer* when it confirmed a reorganization plan providing for compromise of a judgment in excess of $11 billion. The *Texaco* decision sets forth the following criteria to be considered:

1. The balance between the likelihood of plaintiff's or defendant's success should the case go to trial vis-a-vis the concrete present and future benefits held forth by the settlement without the expense and delay of a trial and subsequent appellate procedures.

2. The prospect of complex and protracted litigation if the settlement is not approved.

3. The proportion of the class members who do not object or who affirmatively support the proposed settlement.

4. The competency and experience of counsel who support the settlement.

5. The relative benefits to be received by individuals or groups within the class.

6. The nature and breadth of releases to be obtained by the directors and officers as a result of the settlement.

7. The extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion.

*Texaco*, 84 B.R. at 902.

In order to apply the factors outlined above, this court analyzed the necessary factual background as developed (a) from the proposed findings of fact and conclusions of law of the banks, the Creditors' Committee and the Equity Committee, (b) from a review of the written discovery, documents, depositions of proposed witnesses and similar discovery materials, (c) from the representation of attorneys who investigated the facts, and (d) from argument of attorneys concerning those legal issues. Finally, the court considered the likelihood of success of proving these facts and establishing the legal issues.

This court has read and studied the proposed findings of facts and conclusions of law submitted by the litigants many times. It would not add to the analysis for this court to evaluate in writing each of the disputed facts and conclusions of law. Each count would require a lengthy written analysis. However, the court did evaluate the ease or difficulty of establishing disputed facts, and it did consider the facts proposed as favorable as possible to the party urging such a fact when considering the applicable law. The court is reminded that it is a settlement that is before the court and that a simple majority of the parties involved in the dispute have favored the settlement. In fact, except for one class of preferred, a two-thirds majority has favored the settlement as part of the confirmation of the plan. The burden is on the objecting party to demonstrate that this law suit would provide more than the plan proposes and more than in a chapter 7. To do so, the objecting party must demonstrate the value of the law suit. They have not convinced the court of such value.

In considering the fairness and reasonableness of such a settlement, this court is not required to perform an exact valuation of each issue. The court is not required to conduct a mini trial of the facts. The appellate courts have not required the use of a rigid mathematical for-

mula to set dollar values. To do so "would create an illusion of certainty where none exists and place an impracticable burden on the whole ... [settlement] process." *In re Energy Cooperative*, 886 F.2d at 929, (quoting *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 318 U.S. 523, 565–66, 63 S.Ct. 727, 749–50, 87 L.Ed. 959 (1943)).

The cases teach us that this court must determine "whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities." *Texaco*, 84 B.R. at 902 (quoting *In re New York, New Haven & Hartford R. Co.*, 632 F.2d 955, 960 (2d Cir.1980), *cert. denied*, 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980)). The court concludes that the compromise between the banks and the Creditors' Committee representing AI's interests falls within that reasonable range and is fair.

### 4. Summary of Historical Facts From Early 1972 Through 1986

In the 1970's, AI pursued a strategy of acquisition of consumer products and high technology industrial products and divestiture of the cyclical, labor-capital intensive steel business. In about 1982 AI found itself with a very high level of debt and low profits. It had acquired many operational inefficiencies. AI believed those were due to the number of disparate businesses it owned, high overhead, and a high level of preferred dividends. Between 1982 and 1986, AI carried out a number of divestitures. However, the funds obtained were not used for reducing debt. The cash was used to pay interest expenses and preferred and common dividends. The debtor attempted to retire this expensive preferred stock through purchases largely financed by bank borrowing. During 1984 and 1985, AI individually and separately negotiated lines of credit with many domestic and foreign banks and other lenders.

In October 1985 when the debtor took a write down of approximately $75 million from losses related to real estate and oil and gas investments, the lending parties became alarmed. The public press commented fully on many of the debtor's poor management practices. The sophisticated financial community became aware of AI's problems.

In the fall of 1985, the debtor undertook a review of its activities and hired Merrill–Lynch to study and recommend improvements. Project Keystone resulted. Thereafter the debtor decided to focus on certain "core" businesses centered around consumer products and to divest various other businesses. The evidence offered is convincing that this strategy was not unduly influenced by the banks.

As part of this restructuring, the debtor desired to change from the separate uncommitted short term financing to more committed financing. In October of 1986, the debtor requested that Mellon Bank investigate creating a committed multi-bank lender facility. Following necessary negotiating and business forecasting, the debtor and the banks entered into two revolving credit facilities, a short term one-year facility and a long term two-year facility (collectively referred to as the "loan revolver agreements"). Those agreements are at the center of this dispute.

The previous individual loans were unsecured. The amount of these borrowings was approximately $602 million. As a result of the above negotiations, the banks obtained concessions from the debtor in the form of a pledge of the stock of all of the operating subsidiaries. The agreements also gave the banks rights over certain aspects of the debtor's business and the right to be paid from the divestiture.

During the negotiations, the president of Mellon, George F. Farrell, was a member of the Board of Directors of AI. Mellon acted as the agent for the other banks and led the negotiations. On these facts, this court would easily find that it was clearly inappropriate for Farrell to serve on the debtor's board. Robert F. Buckley, CEO of the debtor, had also served on Mellon's board.

The new loan revolver agreements were tightly drawn. It is clear that the banks had become aware of, and concerned about, the debtor's financial distress and operational losses. It is also true that the debtor

did not achieve its own goals for the remaining core operations which it intended to retain. The debtor conducted the divestitures under pressure to comply with the revolving loan agreements. The plaintiffs attack some of those divestitures as resulting in fire sale prices. Those facts will be difficult to prove at trial.

It will also be difficult for the plaintiffs to prove that the banks planned, originated, and implemented this scheme as a deliberate effort to disadvantage the other creditors, shareholders, and the debtor. The debtor could have chosen another course of action. The debtor's counsel warned the debtor of the legal pitfalls of the revolver loan agreements.

As of the filing of the debtor's petition in February 1988, the bank debt had been reduced from $602 million to $221 million. Moreover, it is also clear that the banks improved their position by obtaining collateral. The priority position of a secured creditor provides the banks with a definite advantage in a bankruptcy distribution and outside of bankruptcy. This settlement significantly diminishes that advantage.

The plaintiffs' ability to recover under several of the causes of action is dependent on the disputed fact of the debtor's solvency. The plaintiffs believe they can establish insolvency as of May of 1986. The result of such an attempt is uncertain. In support of this assertion, the court notes that in March of 1987 First Boston Corporation announced a tender offer of $24.60 for common shares, $20.00 per share for the $2.19 preference shares and $87.50 for the $11.25 preferred shares.[22] Factual and legal evidence of insolvency will be a difficult issue to establish.

The issue of equitable subordination is also risky for the plaintiff. The plain language of 11 U.S.C. § 510(c)[23] does not support the Equity Committee's legal position and makes them dependent on common law doctrines. The doctrine of subordination is remedial, not penal, and is applied only to the extent necessary to offset specific harm caused by inequitable conduct. This court believes that the alleged inequitable conduct is largely comprised of the banks' superior knowledge because of a possible breach by Farrell of his duty as a fiduciary. The court views the evidence offered on the issue of deliberately harmful conduct as not convincing. The court also views the debtor's historically poor performance as a significant factor in this matter. It is clear that the banks improved their position. The remedy of holding the banks as unsecured creditors and denying interest to the banks would be appropriate. That is largely what this settlement accomplishes.

The Equity Committee asserts in Count XI that the banks are liable for Farrell's and Mellon's tortious conduct. The Equity Committee contends that because they have not consented to this settlement this count cannot be settled. These claims have been labeled a "lender liability" claim. Although these causes of action are described by principles frequently used in tort, Count XI of the complaint alleges a claim based upon contract and may not be an action in tort in Pennsylvania.

As stated earlier, the court believes this is a derivative action being brought by the committees on behalf of the debtor. This court by confirming the debtor's plan and agreeing to this settlement binds the creditors and shareholders. As stated above, a

---

**22.** Alas, Spear Leeds & Kellogg, the dominant member of the Equity Committee, refused to tender its shares and is credited with defeating the proposed merger with First Boston. Ansberry *When Will Somebody—Anybody—Rescue Battered Allegheny?*, Wall St.J., April 14, 1990 at 1, Col. 6.

**23.** Section 510(c) of the Bankruptcy Code, 11 U.S.C. § 510(c) provides as follows:

Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

majority of the Equity Committee's clients also have agreed.

### 5. The Settlement is Fair and Reasonable

██ The banks have substantial exposure in this action; the debtor and creditors have exposure if this action fails. The settlement meets the criteria set forth in *Texaco* and the other cases discussed above. The court finds that the proposed settlement of the litigation, as an integral element of the debtor's plan of reorganization, is fair and reasonable.

*Texaco* asked whether there is an appropriate balance reached between the likelihood of success for plaintiff at trial and the concrete present benefits of a settlement. The court believes that the proper balance has been reached and is within the range of reasonableness. The benefits of the settlement are substantial. Those benefits include significant monetary concessions from the banks, as discussed above. Another benefit is the avoidance of further litigation expense. It should be noted that the special counsel hired to conduct this specific litigation for the Creditors' Committee has requested $1.7 million in fees and the Equity Committee's special counsel has requested $600,000 thus far. The parties will incur much greater expenses if this litigation continues. By settling this litigation, the debtor also avoids claims by the banks for additional amounts. If the litigation continues and the banks are successful, they will assert claims for additional post-petition interest through the date that the plan is confirmed and for fees incurred in connection with their defense. Finally, settling this litigation permits the reorganization to conclude. The settlement is an essential element of the debtor's plan. If a settlement is not achieved, the debtor's plan cannot be consummated, and it might be impossible to consummate any plan of reorganization.[24]

In addition to the foregoing, it is significant that the settlement, insofar as it is embodied in the debtor's plan, has received the support of the debtor, the Creditors' Committee and the banks, and has received a two-thirds affirmative vote by the holders of common stock and the senior issue of preferred stock and a simple majority affirmative vote by the junior class of preferred stock. This broad support weighs in favor of approval of the settlement.

The court observes that although the common stock class has voted in favor of the debtor's plan, the Equity Committee, the intervenor plaintiff in this action, opposes the settlement. It is clear that the equity holders have priority behind all creditors in priority of distribution. This court concludes that it is unreasonable to expect that a result could be reached that is large enough to allow the debtor to make all creditors whole and also provide additional compensation to equity holders. Moreover, the Equity Committee's opposition is in conflict with the expressed views of two of its three constituencies and perhaps all three.

The competency of counsel supporting the settlement is a factor to be weighed. The settlement is supported by counsel for the Creditors' Committee, including special litigation counsel, and counsel for the debtor. The competence of counsel has not been challenged.

The final criterion is the extent to which the settlement is truly the product of arm's length negotiations and not of fraud or collusion. The court is convinced that the negotiations between the banks and the Creditors' Committee were at arm's length.

The court finds the settlement before the court is within the range of reasonableness required for approval.

### B. *The Structured Settlement at Class 5.SB.7*

██ Included in the debtor's plan is a structured settlement with the members of Class 5.SB.7.[25] The structured settlement

---

24. The Japonica Plan requires a settlement as well.

25. Class 5.SB.7 (Sunbeam Institutional Unsecured Claims) consists of all unsecured non-pri-

ority claims for borrowed money against Sunbeam held by a financial institution. The members of this class are Prudential Insurance Company of America, Third National Bank of Nash-

provides that the debtors will pay holders of claims in Class 5.SB.7 the full amount of their allowed claims in cash on the effective date of the plan. The settlement provides for an additional $23.75 million in cash to be distributed to Class 5.SB.7 on the effective date in settlement of certain claims and litigation. The claims of this class consist of, in addition to principle, related post-petition charges, expenses, and monthly interest of approximately $34.54 million. Additionally, the settlement further provides for additional interest of $900,000 per month beginning April 1, 1990, and continuing until the effective date of the plan. The cumulative interest accrued at the coupon rate alone is $23.6 million and is increasing monthly. The settlement largely agrees to pay post-petition interest.

On October 11, 1985 Prudential and Sunbeam executed a loan agreement which provided for payment of interest and also expenses.[26] These claims for additional charges, expenses and interest arise from that loan agreement.

The Equity Committee has opposed the structured settlement. The Equity Committee contends that (1) section 502(b) prohibits payment of post-petition interest; (2) Congress did not intend to allow post-petition interest in chapter 11 situations; (3) if Prudential were entitled to post-petition interest, it should not be entitled to the default rate it claims but the statutory rate of interest in Pennsylvania; and, (4) the structured settlement is not within the range of reasonableness.

In order to determine the reasonableness of this settlement, this court must again look to the factors set forth in *In re Texaco, Inc.* Those factors will not be repeated here. The most important factor is the likelihood of success should the issue of interest be decided at trial. Prudential (the majority claimholder in Class 5.SB.7) has filed a complaint to determine the extent of the interest owed to them under the loan agreement. The Equity Committee contends that the members of Class 5.SB.7 are not entitled to any interest because these claimants are not secured.

█ As a general rule, accrual of interest on a debt is suspended upon the filing of a petition in bankruptcy. *Nicholas v. United States*, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966). In general, insolvent debtors are not required to pay post-petition interest to unsecured creditors. However, numerous courts have found that where the debtor proves to be solvent, post-petition interest which accrues on unsecured claims may be allowed. *In re A & L Properties*, 96 B.R. 287 (Bankr.C.D.Cal.1988); *see also, In re San Joaquin Estates, Inc.*, 64 B.R. 534 (9th Cir.1986); *In re Manville Forest Products Corp.*, 43 B.R. 293 (Bankr.S.D.N.Y.1984), *aff'd in part*, 60 B.R. 403 (S.D.N.Y.1986); *In re Boston and Maine Corp.*, 719 F.2d 493 (1st Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1913, 80 L.Ed.2d 461 (1984); *Debentureholders Protective Comm. of Continental Investment Corp. v. Continental Investment Corp.*, 679 F.2d 264 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). By most measures, Sunbeam has been solvent.

In 1984, a similar fact situation occurred in the Johns–Manville Corporation case. Creditors of Manville Forest Products Corporation requested post-petition interest

ville, Government Employees Insurance Company ("GEICO"), and First Wisconsin Trust Company.

**26.** 9.B *Expenses.* The Company agrees ... to pay, and save you harmless against liability for the payment of, all out-of-pocket expenses arising in connection with this transaction, including all taxes, together in each case with interest and penalties, if any, and any income tax payable by you in respect of any reimbursement therefor, which may be payable in respect of the execution and delivery of this Agreement or the execution, delivery or acquisition of any Note issued under or pursuant to this Agreement, all printing costs and the reasonable fees and expenses of your special counsel in connection with this Agreement and any proposed or actual modification thereof or any proposed or actual consent thereunder and the cost and expenses, including reasonable attorneys' fees, incurred by you in enforcing any of your rights hereunder, including without limitation costs and expenses incurred in any bankruptcy proceeding. The obligations of the Company under this paragraph 9B shall survive transfer by you and payment of any Note.

from the solvent subsidiary. The court found as follows:

> [W]here the debtor's estate is sufficient to pay the interest which accrues after the filing date, 'it would seem inappropriate to return to the debtor a surplus of his assets after accommodation of all claims without a distribution to the creditors of accrued interest to the date of payment of the claims by the trustee.' Therefore, where the debtor is solvent, the bankruptcy rule is that post-petition interest which accrues on unsecured claims which are allowable against the debtor's estate will be paid in full before any money is allowed to revert back to the debtor or its shareholders.

*In re Manville Forest Products Corp.*, 43 B.R. 293, 300 (Bankr.S.D.N.Y.1984), *aff'd in part*, 60 B.R. 403 (S.D.N.Y.1986) *quoting* 3 *Collier on Bankruptcy*, ¶ 502.02 at 503–33 (15th ed. 1984). The court then stated that the solvent subsidiary was obligated to pay post-petition interest to lenders on both its secured and unsecured obligations. *Id.* at 300.

The court is convinced that Prudential and the other members of Class 5.SB.7 would succeed on the issue of interest if it were to be tried. The settlement merely gives Class 5.SB.7 interest without the enormous cost of additional litigation.

The Equity Committee contends that even if class 5.SB.7 is entitled to post-petition interest, they would only be entitled to the Pennsylvania statutory rate of 6%. We are not convinced of this contention. "[W]ith respect to creditors who had bargained for a rate of interest ... the bargained-for rate would apply." *In re A & L Properties*, 96 B.R. 287, 289 (Bankr.C.D. Cal.1988). It has also been held that the contractual provision for interest applies post-petition where the estate proves to be solvent. *Debentureholders Protective Comm. of Continental Investment Corp. v. Continental Investment Corp.*, 679 F.2d 264, 269 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982).

For the above-stated reasons, this court finds that the settlement between the debtor and Class 5.SB.7 is within the range of reasonableness.

### C. The Objections of Cowen & Company and Amroc Investments, L.P.

Cowen and Amroc, both general unsecured creditors of Sunbeam and Almet, object to confirmation. Both have been classified in Classes 5.SB.1 and 5.AL.1 and under the debtor's plan are scheduled to receive 100% of the allowed amounts of such claims. Pursuant to section 7.05 of the debtor's plan, the holder of claims in Classes 5.SB.1 and 5.AL.1 have the right to seek payment of post-petition interest by the timely filing of a "Post-petition Interest Declaration" and a final order of the court.

Cowen and Amroc contend that they are subject to disparate treatment and that this constitutes discrimination against "smaller Sunbeam creditors." They allege that there is no difference between themselves and the members of Class 5.SB.7, who have entered into a settlement with the debtor (see the Structured Settlement discussed supra) and those who must request their interest separately. Both creditors overlook the fact that there is a major difference between these classes. The members of Class 5.SB.7 have contractual loan agreements providing for interest, whereas the members of Class 5.SB.1 and 5.AL.1 do not have a contractual agreement that provides for interest. In large part they are trade creditors.

It has been held that "there is no requirement within section 1122 or elsewhere in the Code that *all* substantially similar claims be included within a particular class." *In re Rochem, Ltd.*, 58 B.R. 641, at 642 (Bankr.D.N.J.1985) (emphasis added). "As a general rule the classification in a plan should not do substantial violence to any claimant's interest." *In re LaBlanc*, 622 F.2d 872, 879 (5th Cir.1980). Placing Cowen and Amroc into classes where they receive 100% of their allowed claim and must request post-petition interest does not "do substantial violence" to their interest.

The court determines that a decision by the court about entitlement to post-petition interest would be premature at this time.

None of the claimants in these classes have filed a "Post-petition Interest Declaration." This court finds that the creditors in Classes 5.SB.1 and 5.AL.1 have not been discriminated against by requiring them to make an application. When they file an application for a "Post-petition Interest Declaration," a judicial determination concerning interest will be made. Adequate notice should be provided to interested parties and the Official Committee of Unsecured Creditors of Sunbeam Corporation. The decision rendered upon the first interest declaration may be res judicata upon all others filed and similarly situated.

### D. The Equity Committee's and Japonica's Objection to Confirmation Based on the Actions of Milligan and DLJ

In the analysis of the Japonica and Equity motions to designate which the court denied above, the court promised a further look at the same events as an objection to confirmation. The facts are not in dispute. The purposes and intent of the parties are in dispute. The objectors argued that these purchases were an attempt to entrench the management of Milligan and to ensure control. The defendants argue that this was an attempt to provide liquidity and to provide stability for future shareholders. In any case, Milligan is an insider and it was not appropriate for insiders to participate in these arrangements without disclosure to other creditors. The court is sympathetic to the desire by various potential shareholders for stability and order in the market. The court is not supportive of entrenching any particular management or conversely permitting a control profit not to be widely shared.

The Control Transaction provision, which comes into effect when a Controlling Person owns 30% of the shares, attempts to deal with the problem. That provision is no longer adequate for that purpose. Because the court intends to impose a non-voting limitation on the Japonica shares, a much smaller number of shares could control the reorganized company. Japonica is estimated to control approximately 50%.

Thus, 30% would equate to approximately 60% of the remaining stock.

As part of the confirmation process and as a response to Milligan's involvement and the possibility that control was the objective of DLJ and their affiliates, the triggering 30% control provision is reduced to 15% for as long as the Japonica shares do not have the right to vote.

A plan of reorganization which distributes shares is inherently forward looking. The debtor's plan utilizes a distribution of shares. The debtor's projected sales and profit turnaround is an inherent part of this plan. In this fact situation, these shares carry the hope of future improvement. Warrants even more than shares carry this hope of improvement. A control change could prevent these benefits from being fully realized by shareholders, and also by warrant holders. The debtor is directed to place at least a three-year period of life on the warrants.

Because of the limited number of bank claimants and the large amount of their debt ($186 million), the control provisions in the charter were initially designed to prevent the banks from effecting a change in control and benefitting uniquely.

Even though it now applies principally to Japonica, the court deems it appropriate to continue to achieve this result as part of the confirmation process. As a sanction for the involvement of Milligan and DLJ in this process, the bank agreements entered into with DLJ and others for the purpose of selling issued shares at $6.25 are avoided.

The debtor may develop a procedure to lock up these blocks of stock and to create a facility permitting the orderly sale of shares to the general investing public. The court will retain jurisdiction to insure that these developments are consistent with the plan. A change in control not related to the performance of the debtor is to be discouraged. The new Board of Directors is to be specifically enjoined from permitting such a change without protecting the minority shareholders' and warrant holders' interests.

Japonica will be denied the right to vote its shares for at least three years. Japonica will be enjoined from selling its shares to parties who do not agree in advance to abide by the control provisions. Japonica's voluntary divestiture below 45% or below 30% will not expiate its bad faith activities. Japonica's shares will remain with the debtor in trust for as long as the Japonica shares cannot be voted. The control provision is lowered to 15%. The DLJ/bank contracts to purchase when issued shares at $6.25 are avoided as inconsistent with the control provision and because they were not properly disclosed.

### E. *The Objection of Elliott Associates, L.P. to Confirmation of the Debtor's Joint Plan*

Elliott is an investment fund which purchased approximately 10% of the Chemetron Corporation 9% debentures due 1994. Elliott purchased the debentures long after Chemetron filed bankruptcy. It is a creditor in Class 5.CH.1. The debentures were issued pursuant to an indenture dated September 1, 1969 prior to the Chemetron acquisition by the AI.. Class 5.CH.1 is an impaired class and has accepted the plan.

Elliott objects to confirmation of plan of reorganization. The objection sets forth that the plan violates the best interest of creditors test under 11 U.S.C. § 1129(a)(7), that the plan was not proposed in good faith, and that the plan contains an impermissible cramdown provision.

#### 1. Best Interest of Creditors Test

Section 1129(a)(7) of the Bankruptcy Code sets forth the best interest of creditors test which requires that each holder of a claim in an impaired class of creditors must either accept the plan or receive under the plan property of a value, as of the effective date of the plan, that is not less than the amount such holder would receive under a chapter 7 liquidation.

The debtor's disclosure statement contains a liquidation analysis at Exhibit 14 and at page IX–4 which sets forth what creditors would receive in a chapter 7 liquidation. The debtor's experts testified in support of these values and the court has adopted these values. (See Section III supra.) Under the debtor's liquidation analysis creditors of Chemetron would receive 27% to 29% of the value of their claims. Under the plan, Chemetron creditors are receiving 93.2% of the value of their claims, using a $7.00 per share value of the reorganization securities.

Elliott argues that the investment banker for the Creditors' Committee has opined that the initial trading price of the stock may be lower than the value set forth in the debtor's disclosure statement. Therefore, Elliott contends that the value of the property they are receiving, as of the effective date, may be less than under a chapter 7 liquidation. The recovery to Chemetron at 27–29% would be roughly equivalent to a $2.03–$2.18 per share. Thus, for Chemetron creditors to receive less than they would receive in a chapter 7 liquidation, the stock would have to trade below $2.02 per share. This court finds that the shares are valued properly at $7.00 per share; the shares are not likely to trade at such low levels.

Elliott further argues that if only Chemetron were liquidated, Class 5.CH.1 would receive a 100% distribution; Elliott contends that the debtor's liquidation analysis is flawed; other corporate parts of the debtor need not be liquidated for a proper chapter 7 liquidation analysis. Elliott argues somewhat obtusely that liquidation should be analyzed as though the debtor's plan was confirmed with only Chemetron liquidated. Elliott believes that under such a scenario, Chemetron creditors would then receive the same distribution proposed for Class 5.AI.1, General Unsecured Creditors. Class 5.AI.1 consists of $48.2 million of claims which are to receive 3,476,000 shares valued at $7.00 per share. This amounts to a 60.5% recovery under the plan. However, Elliott fails to consider that it would result in 6.4–6.9% on liquidation of AI.

The debtor's plan has not placed the Chemetron claimants in the unsecured class. The plan has treated Chemetron claims in a separate class because they are only derivative of an unsecured claim and

must share with other unliquidated claims. Adding $185 million of intercompany claims to the unsecured Class 5.AI.1 would increase this class by 4.8 times and would amount to rewriting the plan.

It is obvious that creditors in classes with higher priority than the Chemetron claimants would be diluted by such action. Those creditors accepted less than full value of their claims in a plan which included the plan's treatment of the Chemetron claims. Elliott argues for the benefit of only part of the confirmation bargain that it otherwise wishes to defeat. The court could not, as part of confirmation, modify the debtor's plan and order such a distribution to the Chemetron claimants.

It is clear from the objection that Elliott does not fully comprehend the debtor's plan. Chemetron is not being liquidated. Chemetron will continue to have an intercompany claim against the reorganized debtor. The intercompany claim is being reinstated in the plan.

Chemetron is a nonoperating company with one asset, an intercompany claim against AI of approximately $185 million. There are approximately $36.2 million of known liquidated claimants at Chemetron and the plan provides a 93.2% distribution at $7 per share to them. Elliott ignores the fact that there are other substantial claims against Chemetron that are not liquidated! The debtor established that there are approximately 8 superfund sites and the McGeon Nuclear site that have large potential environmental claims, in addition to the $36 million of liquidated claims. The intercompany claim upon which Elliott relies is also liable for these claims. The debtor is reinstating these large unliquidated claims and proposing to pay the liquidated claims such as Elliott. If these unliquidated claims are reinstated, the debtor expects over time that their liability could be managed better and may even be reduced. If they are liquidated now, the United States could raise claims as high as $200 to $600 million and prevent any distribution to the Chemetron claimants. The assurance of a reliable financial entity, such as the reorganized debtor, and reinstatement has

satisfied the environmental claimants. Chemetron alone could not provide such assurance.

In addition, there are claims of retirees, product liability claims and various industrial revenue bond claims at Chemetron that would require liquidation before distribution could be made to the $36.2 million of known Chemetron claims. Elliott improperly analyzed these unliquidated liabilities in relation to the $185 million intercompany claim. The debtor's evidence on the matter of unliquidated claims was creditable.

Further, the Creditors' Committee believes that the affairs of Chemetron are so intertwined with AI that substantive consolidation is the correct equitable result. It is clear the Creditors' Committee will object to the payment of this intercompany claim on that basis. Any separate liquidation of Chemetron will substantially delay the distribution to Chemetron claimants and could defeat their payment.

Elliott's analysis is seriously defective. Because the class into which Chemetron's intercompany claim could be classified is receiving a distribution of 60.5%, Elliott has calculated that 60.5% of $185 million, or $111 million, should be available for distribution to the liquidated Chemetron claimants. At best it would need to be shared with the unliquidated claims above.

More important, if the plan is not confirmed, upon liquidation, the unsecured creditors of Class 5.AI.1 would receive 6.4–6.9% (see Disclosure Statement, IX–4), not 60.5%; 6.9% of $185 million, approximately $13 million, is available. The debtor estimated that Class 5.CH.1 consisting of the liquidated $36.2 million claims would receive 93.2% under the plan and they estimate only 27–29% on liquidation. Even that analysis, however, does not account for the unliquidated claims such as environmental, retirees, etc. Without a reorganized debtor, a liquidation of AI or Chemetron or both will produce much less than 27–29% for the Chemetron claims.

The court finds that Chemetron creditors are receiving substantially more than they would under a chapter 7 liquidation and that the plan thus satisfies the "best inter-

est" test of § 1129(a)(7). Elliott's objection with regard to the best interest of creditors test must be overruled.

### 2. Good Faith Objections

Elliott contends that the provision of the plan which requires the withdrawal of the plan as to Chemetron if Chemetron creditors do not vote to accept the plan was not proposed in good faith. As a practical matter, in a complex chapter 11 with subsidiary debtors such as this, the only method to confirm the plan, if creditors of any subsidiary did not accept, is to withdraw the plan as to that subsidiary debtor and propose an alternative treatment. Clearly, such provision was included for the purpose of assuring a confirmable plan and was made in good faith. It is moot, however, since the Chemetron class accepted the plan.

Elliott further objects that the intention of the Creditors' Committee to object to the Chemetron intercompany receivable was not in good faith. The statement merely reflected the already pending Motion for Substantive Consolidation and was required to disclose to all creditors of Chemetron that the Motion for Substantive Consolidation would not be dismissed in the event that such creditors rejected the plan. Moreover, consistent with its statement of intention on April 30, 1990, the Creditors' Committee filed its Motion for Substantive Consolidation and Objection to the Chemetron Intercompany Claims. Despite the debtor's assertions about the intercompany receivable, it has been and remains the position of the Creditors' Committee that Chemetron is merely a shell corporation which long ago had been merged with AI and the intercompany receivable was not an asset of the Chemetron estate. Rather, the Creditors' Committee asserts that the Chemetron and AI estates should be treated as one, and the Chemetron creditors should not receive treatment superior to the creditors of AI. This objection is denied.

### 3. Impermissible Cramdown

The allegation set forth by Elliott with regard to the impermissible cramdown has been rendered moot by virtue of the fact that the class of creditors at Chemetron voted to accept the debtor's plan. The objection is also misplaced because the plan does not provide for the cramdown of Chemetron, but merely provides that the plan would be withdrawn as to Chemetron and that Allegheny would have to provide for alternative treatment for Chemetron creditors in the future.

The rationale for providing that the Chemetron creditors would not receive a distribution is based upon the fact that the intercompany receivable upon which their distribution depends is a disputed claim. This treatment is consistent with the treatment of other disputed claims in the plan. No creditor whose claim is disputed shall receive a distribution under the plan until their claim is resolved. Thus this objection is unfounded.

## V. CONCLUSION

The court believes that the preceding discussion addresses all substantial objections to confirmation. Other matters are addressed in the Order of Confirmation. The court finds that the debtor's plan of reorganization fully satisfies the requirements of 11 U.S.C. § 1129.

An appropriate order is attached.

### CONFIRMATION ORDER

WHEREAS, the above memorandum has made findings of fact and conclusions of law as to disputed matters;

WHEREAS, the Debtors' Joint Stock Plan of Reorganization dated December 29, 1989, filed by the Debtors on December 29, 1989, as amended by the Debtor's Joint Stock Plan of Reorganization filed by the debtors on February 2, 1990 (hereinafter referred to as the "Joint Stock Plan"), having been transmitted to creditors and equity security holders; and

WHEREAS, the court has determined after hearing on notice that:

1. The rejections of the Joint Stock Plan filed by Japonica Partners, L.P. ("Japonica") and their affiliates should be designated pursuant to 11 U.S.C. § 1126(e) and that votes cast against the plan were not in good faith and were not solicited or pro-

cured in good faith and in accordance with the provisions of Title 11 of the United States Code; and, therefore, the court finds that Class 2.AI.2 Allegheny Secured Bank Claims and Class 4.AI.2 Allegheny Senior Unsecured Claims have accepted the plan;

2. The Joint Stock Plan does not discriminate unfairly, and is fair and equitable, with respect to the class of the holders of the issued and outstanding $11.25 Convertible Preferred Stock, Class 8.AI.2, the only impaired class of claims or interests which did not accept the Joint Stock Plan;

3. Pursuant to the provisions of Article 7.16, Cramdown of the Plan, the court has found that the "foregoing distributions are not permitted" and further that the settlement of the bank litigation requires that Class 8.AI.2 shall receive the warrants as provided by acceptance of the Joint Stock Plan and that Class 9.AI.1 Allegheny Common Stock shall also receive warrants as provided by acceptance of the debtors' plan;

4. The Joint Stock Plan has been accepted in writing by the creditors and equity security holders whose acceptance is required by law;

5. The debtors filed modifications to the Joint Stock Plan on July 5, 1990, which, by virtue of this court's orders of April 30, 1990, at Motion Nos. 90–2505M and 90–2877M were deemed accepted by all creditors and equity security holders who accepted the Joint Stock Plan (the Joint Stock Plan as so modified being hereinafter referred to as the "Joint Stock Plan");

6. The provisions of Chapter 11 of the Code have been complied with; the Joint Stock Plan has been proposed in good faith and not by any means forbidden by law;

7. Each holder of a claim or interest has accepted the Joint Stock Plan or will receive or retain property of a value, as of the effective date of the Joint Stock Plan, that is not less than the amount that such holder would receive or retain if the Debtor against which or in which the holder holds its claim or interest were liquidated under Chapter 7 of the Code on such date;

8. All payments made or promised by the Debtors or by persons issuing securities or acquiring property under the Joint Stock Plan or by any other person for services or for costs and expenses in, or in connection with, the Joint Stock Plan and incident to the case, have been fully disclosed to the court and are reasonable or, if to be fixed after confirmation of the Joint Stock Plan, will be subject to the approval of the Court;

9. The identity, qualifications, and affiliates of the persons who are to be directors or officers or voting trustees, if any, of a Debtor, or a successor to the Debtor under the Joint Stock Plan, after confirmation of the Joint Stock Plan, have been fully disclosed, and the appointment of such persons to such offices, or their continuance therein, is equitable and consistent with the interests of the creditors and equity security holders and with public policy and their names are as nominated by management, William M.R. Maple, James Milligan and Samuel Iapalucci, and as nominated by the Banks, in Class 2.AI.2, John R. Isaac, Jr., L. Gerald Tarantino, and as nominated by the Unsecured Creditors, Roderick M. Hills and R. Guy Boyle;

10. The identity of any insider that will be employed or retained by the debtor, and his compensation, have been fully disclosed except that the compensation by distribution of shares as disclosed in the Disclosure Statement is not allowed;

11. Confirmation of the Joint Stock Plan is not likely to be followed by the liquidation or the need for further financial reorganization, of any of the debtors or any successor to any of the debtors under the Joint Stock Plan;

12. The debtors have filed their Schedule of Rejected Executory Contracts and their Schedule of Assumed Contracts pursuant to Article IX, Section 9.01 of the Joint Stock Plan;

13. The Joint Stock Plan incorporates the settlement, compromise, and dismissal with prejudice of all claims in the action pending in this court at Adversary Proceeding 88–186 against Mellon Bank, N.A. and other secured lenders to Allegheny. The

settlement, compromise, and dismissal with prejudice of Adversary Proceeding No. 88–186 (the "Bank Dismissal") is conditioned upon the Joint Stock Plan and the Joint Stock Plan is conditioned upon the settlement, compromise and dismissal of Adversary Proceeding No. 88–186. If the Joint Stock Plan is withdrawn for Allegheny, then the Bank Dismissal shall become null and void and this order shall not prejudice the rights of any person with respect to the Adversary Proceeding. The court finds that the proposed settlement and compromise is in the best interests of the estate and that the terms thereof fall within the reasonable range of litigation possibilities. Accordingly, the settlement, compromise and dismissal with prejudice of the Adversary Proceeding is approved and that the provisions of Exhibit D are hereby adopted for that purpose;

14. The court has carefully reviewed the joint application of the Official Committee of Unsecured Creditors of Sunbeam Corporation ("Sunbeam"), Almet/Lawnlite, Sunbeam Holdings Corporation, and Chemetron Corporation; The Prudential Insurance Company of America, and the Debtors in support of the Structured Settlement of claims of certain creditors of Sunbeam classified as Class 5.SB.7, as well as the record and memoranda of law submitted at Adversary Proceeding No. 88–395 (the "Prudential Adversary") and court adopts as its finding the data in Exhibit B and the court finds that the Structured Settlement is in the best interest of the Debtors' estates and falls within the range of reasonableness. Accordingly, the court hereby approves the Structured Settlement;

15. The provisions of Exhibits A, B, C and D attached to Joint Stock Plan as shown in the Disclosure are specifically adopted and incorporated here as part of findings related to the Order of Confirmation;

IT IS ORDERED THAT:

1. The Joint Stock Plan, filed at docket no. 6530 on February 2, 1990, as amended by Debtors' Modifications to Joint Stock Plan of Reorganization Dated December 29, 1989 as Amended, Filed February 2, 1990, filed at docket no. 7871 on July 5, 1990, which is incorporated by reference, is confirmed;

2. The debtors are discharged effective on the effective date from any claim and any "debt" (as that term is defined in Code Section 101(11) that arose before the confirmation date, except for claims or debts which are reinstated by the express provisions of the Joint Stock Plan), and the Debtors' liabilities in respect thereof are extinguished completely, whether reduced to judgment or not, liquidated or unliquidated, contingent or noncontingent, asserted or unasserted, fixed or not, matured or unmatured, disputed or undisputed, legal or equitable, known or unknown, that arose from any agreement of any of the debtors entered into or obligation of any of the Debtors incurred before the confirmation date, or from any conduct of any of the debtors prior to the confirmation date, or that otherwise arose before the confirmation date, including, without limitation, all interest, if any, on any such debts, whether such interest accrued before or after the date of commencement of the relevant reorganization case, and including, without limitation, all debts based upon or arising out of any liability of a kind specified in Code Section 502(g), 502(h) and 502(i), whether or not a proof of claim is filed or deemed filed under Code Section 501, such claim is allowed under Code Section 502, or the holder of such claim has accepted the Joint Stock Plan, and (b) each of the debtor's liabilities for such claims and debts are limited to the amounts such Debtor is paying or causing to be paid pursuant to the Joint Stock Plan and pursuant to promissory notes and accompanying contracts with respect to holders of allowed secured claims;

3. The Joint Stock Plan does not provide for the liquidation of all or substantially all of the property of any of the Debtors;

4. The provisions of the Joint Stock Plan and this Confirmation Order are nonseverable and mutually dependent;

5. All executory contracts (including, without limitation, product, patent, trademark, and know-how licenses) and unex-

pired leases assumed by any of the Debtors during the reorganization cases or under the Joint Stock Plan shall be assigned and transferred to, and remain in full force and effect for the benefit of, the respective reorganized company notwithstanding any provision in such contracts or leases (including those described in Code Sections 365(b)(2) and (f)) that prohibits such assignment or transfer or that enables or requires termination of such contract or leases;

6. This court, notwithstanding entry of this Confirmation Order, shall retain jurisdiction to (a) hear any action initiated by the reorganized companies seeking to avoid or attack, as fraudulent or preferential transfers, under Code Sections 544, 547, 548 or 550, prepetition transfers or conveyances of the Debtors' assets and (b) any claim for postpetition interest as specified in a timely filed postpetition interest declaration and (c) as provided in Section 10.03 of the Joint Stock Plan;

7. Except as otherwise expressly provided in the Joint Stock Plan, on the effective date each reorganized company will be vested with all of the property of its estate free and clear of all claims, liens, encumbrances, charges and other interests of creditors and equity security holders, and may operate its businesses free and clear of any restrictions imposed by the Code or by the court; provided, however, that each debtor shall continue as a debtor-in-possession under the code until the effective date, and, thereafter, each debtor may operate its businesses free of any restrictions imposed by the Code or by the court;

8. No Claims for postpetition interest may be heard by the court unless such postpetition interest claims are specified in a timely filed postpetition interest declaration. The Debtor is to provide a proper notice to such creditors as provided in section 7.05 of the Plan.

9. No extraordinary compensation or reimbursement of expenses will be awarded to any person required to file a binding compensation estimate (i) who does not file a timely binding compensation estimate, or (ii) in excess of the amount set forth in a timely binding compensation estimate as provided in 7.07 of the plan;

10. All common stock to be issued pursuant to the Joint Stock Plan shall be validly issued, fully paid and nonassessable. By reason of Section 1145 of the Code, the Convertible Asset Sale Certificates, the Warrants to be issued under the Joint Stock Plan and the common stock issuable upon exercise of the Warrant and the Convertible Asset Sale Certificates shall be exempt from registration under Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for offer or sale of a security;

11. The action pending at Adversary No. 88–186 as provided in Section 5.04(a) of the Joint Stock Plan shall be dismissed on the effective date, with prejudice, and such settlement and dismissal is reasonable and in good faith and is hereby approved;

12. All claims by any party that were or could have been asserted in the motion of the Official Committee of Unsecured Creditors of Allegheny International, Inc. for substantive consolidation (Motion No. 88–5652M) including the objection raised by Chemetron at Motion No. 90–3260M, among Allegheny, Sunbeam and any other Debtor reorganized pursuant to the Joint Stock Plan are dismissed with prejudice effective on the effective date;

13. Except as otherwise provided in this order, on the effective date this order acts as a full and complete release and discharge by the Debtors and by any and all third parties including, without limitation, creditors, shareholders, or any other party in interest, of the indenture trustees and the members and ex officio members of the official committees appointed in this case, their respective representatives, agents, employees, and counsel from any further obligation and from any and all manner of action and actions, causes of action, claims, obligations, suits, debts, sums of money, accounts, reckonings, covenants, contracts, controversies, agreements, promises, damages, judgments, and demands whatsoever, whether in law or in equity, which the Debtor or any such third parties had, may in the future have, or now has, whether

known or unknown, contingent or absolute arising from any actions taken or not taken in such capacity as an indenture trustee or as a member of one of the official committees, including any negligent action or inaction, provided that nothing in this order shall be deemed a release of any claims against those insurance companies which held claims in Class 4.AI.2 relating to breach of their fiduciary duties. The court adopts Exhibit C Release for this purpose;

14. No later than the effective date, the Banks and Allegheny are directed and instructed to take any and all actions which may be necessary or appropriate to consummate the Bank Dismissal approved hereby and to implement said Bank Dismissal, including but not limited to the execution of the Release, a copy of which is attached to the Joint Stock Plan as Exhibit C;

15. The court retains jurisdiction to enforce the provisions of this order and the Bank Dismissal approved herein except as provided in Exhibit C;

16. All persons (including those persons holding Senior Indebtedness as that term is defined in the Public Subordinated Debt Trust Indentures) are permanently enjoined from enforcing or seeking to enforce any claimed contractual subordination rights with respect to distributions to the holders of the Public Subordinated Debt and to the Indenture Trustee;

17. The Structured Settlement of claims of certain creditors of Sunbeam, classified as Class 5.SB.7, is hereby approved;

18. In response to the litigation at Adversary Proceeding 90–260 and the findings of fact and conclusion of law made in the memorandum above and pursuant to authority granted in 11 U.S.C. § 105, all shares to be distributed to Japonica or their affiliates shall be held in trust by the Debtors for three years and shall *not* be entitled to vote on any matter while in trust or owned by Japonica during those three years; however, Japonica may enjoy the other benefit of ownership such as dividends and proceeds from sales;

If within forty-five days or less from the date of this order (*i.e.* on or before August 27, 1990) Japonica agrees to the provisions and establishes the ability to respond to the shareholders' "puts" at $7 per share and $1.53 per warrant, then the Debtors and Japonica, upon motion to this court, shall promptly facilitate the purchase transactions and orderly change in control of the Reorganized Debtor. If Japonica does not so establish its agreement and ability within 45 days, the trust of Japonica shares shall continue for three years. During that time, the shares owned by Japonica are not entitled to vote while owned by Japonica or parties with which Japonica is affiliated. Japonica may choose to continue to own the shares or set in motion, with the cooperation of the Debtor or the Reorganized Debtor and the consent of this court, an orderly sale of such shares to third parties who shall be required to consent to the control provisions and the Order of Confirmation. Upon such sale, these shares shall be entitled to vote.

19. Because the Japonica shares shall not be entitled to vote and because Japonica owns or controls 45 to 50% of the total shares and further because of the undisclosed involvement of insiders, innocent or otherwise, with the Banks, Donaldson, Lufkin & Jenrette ("DLJ") and its affiliates; the control provisions of the charter of the Reorganized Debtor are reduced to 15% of the total shares for so long as Japonica owns any shares or for at least three years whichever is longer. This 15% provision shall apply to all shareholders including employees or insiders who are promised shares but have not received them.

20. Pursuant to 11 U.S.C. § 105, the contracts between DLJ and their affiliates and the Banks for when-issued shares are avoided and of no effect;

21. Any change in control (15% or more) for at least three years shall also trigger a put provision as to the warrants for a value of at least $1.53 per warrant.

22. The contractual provisions for payment to James D. Milligan of those shares which were to be paid to him on a time vesting basis over three years in exchange for him waiving his rights to his annual

salary are not approved. The Debtors have withdrawn these provisions. The Debtors intend to recommend to the Board of Directors of the Reorganized Company that all shares to be paid to Milligan be paid on the basis of performance. The new agreement is to be submitted by the outside Directors of the Reorganized Company. These changed provisions are to be submitted to creditors on Service List 6; objections may then be raised and a hearing conducted.

23. All duplicative objections to confirmation which have been raised which are similar to those issues discussed in the memorandum are decided similarly and denied;

24. The objections raised by Finalco Inc., First National Bank of Chicago, and Sovran Bank are considered matters to be first decided in procedures for objection to claims. The Debtors are to schedule hearings promptly. The substance of these disputes are not decided here except to determine that they do not constitute an objection to confirmation at this time;

25. By approving the Joint Stock Plan, holders of Class 7.AI.1 (Allegheny Subordinated Debenture Claims) accept the resolution of the dispute over original issue discount set forth in Section 7.17 of the Joint Stock Plan. Such section provides that this court's Memorandum Opinion and Order of Court of May 18, 1989 (the "OID order"), at docket No. 4658, which has been appealed to the United States District Court for the Western District of Pennsylvania (the "appeal"), shall become a final order. All parties to the appeal are directed to withdraw their respective appeals to permit the OID order to become a final order.

26. All remaining objections are denied.

All parties are granted five days, until July 17, 1990, to raise matters which have been inadvertently omitted or not properly addressed in the order, for which a hearing is set on July 19, 1990 at 9:30 A.M. in Room 1603 Federal Building, Pittsburgh, PA 15222.

All parties are granted until July 23, 1990 to raise motions to reconsider substantive matters for which a hearing is set for July 26, 1990 at 9:30 A.M. in Room 1603 Federal Building, Pittsburgh, PA 15222.

## ON MOTION FOR RECONSIDERATION

The matters presently before the court are the motions for reconsideration filed by the debtor,[1] the secured bank lenders (the "banks"), Fidata Trust Company New York ("Fidata"), the Official Committee of Equity Security Holders of Allegheny International, Inc. (the "Equity Committee"), and Cowen & Co. ("Cowen"). The movants seek reconsideration of this court's Memorandum Opinion and Order of Court of July 12, 1990 (the "Memorandum Opinion and Order"). In addition, the court will address certain matters which the debtor, the Equity Committee, and the banks previously raised as technical matters, but which the court considered in the nature of motions for reconsideration. For the reasons set forth below, the debtor's motion is granted; the banks' motion is granted in part and denied in part. The motions of Fidata and the Equity Committee are denied. Cowen's motion is denied as untimely.

### I. *The Debtor's Motion*

The debtor requests that paragraph 22 of the confirmation order, which deals with the time vesting of shares to be paid to the management of the reorganized debtor, be clarified to indicate that it applies only to James D. Milligan, the chief executive officer designate of the reorganized debtor. In drafting the confirmation order, the court intended to apply those provisions only to the top executives, rather than to all employees across-the-board. Therefore, paragraph 22 is modified, as requested by the debtor.

In a previous filing, the debtor requested that paragraph 24 be modified to delete references to the Jasper County Board of Supervisors ("Jasper County") and the Sec-

---

1. In this opinion, the court refers to Allegheny International, Inc., Sunbeam Corporation, Sunbeam Holdings, Inc., Almet/Lawnlite, Inc., Chemetron Corporation, and ten of the fourteen subsidiaries that filed for chapter 11 relief on May 3, 1988 collectively as the debtor.

retary of the Department of Revenue and Taxation of the State of Louisiana (the "Secretary"). Paragraph 24 deals with miscellaneous objections to confirmation which the court construed as matters related to the allowance of claims. In its objection, Jasper contends that an unexpired lease from Jasper to Sunbeam may not be assumed by the plan of reorganization, because the lease was automatically rejected pursuant to 11 U.S.C. § 365(d)(4). However, the court extended the time to assume or reject unexpired leases until confirmation of the plan of reorganization. Therefore, the complaint of Jasper was not related to allowance of a claim and should be deleted from paragraph 24.

The objections of the Secretary relate to the interest rate and frequency of deferred payments under the plan. Thus, the Secretary's objections are not related to a claim and should be deleted from paragraph 24. Moreover, the applicable provisions of the plan of reorganization do not violate 11 U.S.C. § 1129(a)(9)(C).

## II. *Fidata's Motion*

Fidata seeks reconsideration of the court's ruling on section 7.16 of the plan, which Fidata refers to as the "clawback" provision. Section 7.16 provides that if any class of equity security holders does not accept the plan, than the warrants due to that class—and any junior class—revert to Class 7.AI.1, the subordinated debt. The court struck such provision as discriminatory, and held that Class 8.AI.2 and Class 9.AI.1, the classes affected by section 7.16, should receive the distribution contemplated by the plan of reorganization.

Fidata complains that section 7.16 was a carefully negotiated and drafted attempt to provide value to equity holders to induce them to vote for the plan, thereby avoiding cramdown and the attendant valuation process. Because Class 8.AI.2 did not vote for the plan, valuation and cramdown occurred. The manner in which the court approved the cramdown denied Fidata the benefit of its bargain. Fidata contends that section 7.16 is not prohibited by the Bankruptcy Code and does not constitute "unfair discrimination," as that term is used in 11 U.S.C. § 1129.

This is a unique problem. It is clear to the court that under the absolute priority rule, there is insufficient value to provide a distribution to all classes of equity holders. However, as the court discussed at length in the Memorandum Opinion, the equity holders were also offered these same warrants for settling, inter alia, the litigation against the banks (Adversary No. 88–186). The valuation which the court accepted, as well as the valuation urged by the Equity Committee, did not separately consider the value of the bank settlement, even though the plan of reorganization proposes and requires the settlement of that action. Moreover, one of the reasons the equity classes were offered warrants was to reduce all litigation. If the court views the distribution of warrants as the result of the bank settlement, the warrants given to the equity security holders were not "taken away" from Class 7.AI.1, the subordinated debt holders. Moreover, if the settlement of the action against the banks is not consummated, the reorganization cannot be consummated. Such a result would be deleterious to all classes, including Class 7.AI.1.

In retrospect, rather than hold that section 7.16 was "discriminatory," the court could have used different terminology. Nevertheless, section 7.16 remains unacceptable to the court for the reasons stated above.

## III. *The Banks' Motion*

In response to the banks' adversary proceeding against Japonica Partners, L.P. ("Japonica"), the court imposed a trust on the stock to be received by Japonica under the plan of reorganization. The Memorandum Opinion did not specifically provide for the treatment of any cash distributions to Japonica for its bank claims. The banks request that any cash distributed to Japonica under the plan also be held in trust to ensure that the banks can enforce potential judgments against Japonica. The banks also suggest that the Memorandum Opinion and Order are unclear as to whether

another control purchaser would have to purchase Japonica's shares and whether other stock holders can sell blocks of shares. The banks also complain that the Order grants warrant holders the right to receive $1.53 per share in a control transaction, irrespective of the amount paid for the common stock of the reorganized debtor in such a transaction.

As stated in the Memorandum Opinion and Order, the court used its injunctive power in as limited a manner as was appropriate, and did not intend to deprive Japonica of all of the benefits of its various bargains. Therefore, Japonica may put its shares in the event of a control transaction by another entity. However, because of this court's clear statement that the best chance to maximize recovery for all creditors and present equity holders lies in a turnaround by the debtor, which is estimated to take three years, control transactions are especially discouraged for three years. Creditors should not be deprived of the benefit of a turnaround. Any control transaction must strictly comply with the control transaction provisions set forth in the certificate of reorganization of the reorganized debtor, as modified by the Memorandum Opinion and Order of Court. With respect to the banks' concern about distribution of cash to Japonica, the court modifies the Memorandum Opinion and Order to hold that Japonica shall not receive any distribution of cash during the pendency of an appeal by Japonica. With respect to the banks' complaint that the Memorandum Opinion and Order imposes a minimum purchase price for the warrants, but not for the shares, the court does not see the need to similarly protect shareholders since they will elect directors to the board of the reorganized debtor.

Of a technical nature, the banks suggest that paragraph 13 of the Order of Court, which provides, inter alia, for a release of claims against members of the official committees, be modified to exclude from the release possible breaches of fiduciary duties by certain former holders of claims in Class 4.AI.2 who sold their claims to Japonica. The banks also suggest that paragraph 9, which names the directors of the reorganized debtor, be modified because it fails to designate the class of directors for each of the directors nominated by the banks. The banks desire to indicate that one of their nominees, L. Gerald Tarantino, be placed into the third class of directors. Both of the modifications mentioned in this paragraph are approved. However, the events related to the sale of claims by members of the Official Committee of Unsecured Creditors of Allegheny International, Inc. (the "Creditors' Committee") are not covered by paragraph 13. The court does not decide whether those events are, or are not, breaches of fiduciary duties.

IV. *The Equity Committee's Motion*

The Equity Committee continues to challenge the methods and results of the valuation of the debtor by the debtor's financial advisor, Smith Barney, Harris, Upham & Co ("Smith Barney"). The Equity Committee, inter alia, suggests that the court erred by failing to include the $170 million in excess working capital of the debtor in determining valuation. With respect to this objection, the court notes that such excess working capital was included in Smith Barney's valuation. With respect to the Equity Committees's other objections concerning valuation, the court affirms its decision, as set forth in the Memorandum Opinion. The court notes again that although Charles River Associates ("CRA"), the Equity Committee's financial advisor, properly used the debtor's projections, it did not consider the inherent business risk of achieving those projections. In comparing companies which had emerged from chapter 11 to the debtor, CRA did not use the projections of those companies. Rather, CRA used actual performance versus stock price. In the instant case, CRA is treating the debtor's projections as *having been realized!* CRA did not adjust their factor to account for such risk.

The Equity Committee also argues that the court erred by holding that 11 U.S.C. § 1126(e) does not empower the court to designate the votes of innocent creditors and interest holders. Section 1126(e) provides that "the court *may* designate" the

votes "of any entity ... whose acceptance was not solicited or procured in good faith...." (emphasis added). Even if the court adopts the interpretation of section 1126(e) urged by the Equity Committee, the court will not designate the votes in favor of the debtor's plan of reorganization. Although the court was critical of the attempted transaction between Donaldson Lufkin & Jenrette Securities Corp. ("DLJ") and the banks, there was insufficient evidence of bad faith by the debtor or James D. Milligan. Even though the court criticized the attempted transaction between DLJ and the banks as "inept and ill-timed," and imposed appropriate sanctions, the court did not make a finding of bad faith. Rather, the court found clear and convincing evidence that the banks would have voted for the debtor's plan even without the opportunity to sell their when-issued shares. The Creditors' Committee had also indicated its continuing support of the debtor's plan, notwithstanding the matters of which the Equity Committee complains. Therefore, the court affirms its decision not to exercise its discretion to designate the votes in favor of the debtor's plan.

V. *Cowen's Motion*

The Memorandum Opinion and Order of Court set July 23, 1990 as the deadline for moving for reconsideration. Cowen attempted to serve its motion by telecopier on that date. Cowen was under the mistaken belief that filing by telecopier was permissible in the instant case. It is not. Therefore, Cowen did not file a timely motion. Cowen has moved for leave to file its motion for reconsideration nunc pro tunc, but the circumstances related by Cowen do not constitute excusable neglect. Therefore, Cowen's motion for leave to file its motion nunc pro tunc is denied. Cowen's motion for reconsideration is denied as untimely. However, the court does not believe that Cowen has been prejudiced, since the substantive matters underlying its motion will be heard in connection with postpetition interest applications.